McCLELLAN ECOLOGICAL SEEPAGE SITUATION (MESS), Mary Fisher, Charles and Sandy Yarbrough, Plaintiffs,

v.

Richard B. CHENEY, Secretary of the United States Department of Defense, Defendant.

Civ. No. S-86-0475-RAR.

United States District Court, E.D. California.

Aug. 31, 1989.

Michael Axline, John E. Bonine, Western Natural Resources Law Clinic, Eugene, Or., Duane Miller, Miller & Rolfe, Sacramento, Cal., for plaintiffs.

Donald A. Carr, Acting Asst. Atty. Gen., Stephen L. Samuels, Asst. Chief, Environmental Defense Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., David F. Levi, U.S. Atty., Yoshinori H.T. Himel, Asst. U.S. Atty., Sacramento, Cal., for defendant.

## MEMORANDUM OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

RAMIREZ, District Judge.

### INTRODUCTION

This action arose on April 23, 1986, when plaintiffs McClellan Ecological Seepage Situation, Mary Fisher, and Charles and Sandy Yarbrough (hereinafter "MESS") filed a lawsuit seeking declaratory and injunctive relief as well as civil penalties against the Secretary of the Department of Defense under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6991i; the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1387; California hazardous waste laws; and California water quality laws. The original complaint, which included twenty-three counts, alleged violations of those statutes by McClellan Air Force Base ("McClellan"), located in Sacramento, California.

On December 9, 1986, this Court granted the Government's motion to dismiss MESS' request for relief in the form of civil penalties. *McClellan Ecological Seepage Situation (MESS) v. Weinberger*, 655 F.Supp. 601 (E.D.Cal.1986). That determination was made based upon the Court's conclusion that neither the federal facilities provisions nor the citizen suit provisions of RCRA or the Clean Water Act waived the United States' sovereign immunity to civil penalties.[1]

In the summer and fall of 1987, the parties filed cross-motions for summary judgment with respect to the substantive claims in MESS' complaint. On June 20, 1988, this Court issued an opinion and order on those cross-motions. *McClellan Ecological Seepage Situation (MESS) v. Weinberger*, 707 F.Supp. 1182 (E.D.Cal.1988). That decision dismissed large portions of the complaint and left other issues open for further factual development.

---

1. By stipulation and order, Counts 1, 4(A), 7, and 19(C) of the complaint have been dismissed without prejudice. (Orders dated August 4, 1987 and September 25, 1987.)

Meanwhile, on March 31, 1988, the Court granted a motion filed by MESS for leave to file an amended complaint in order to allege an additional cause of action under the Administrative Procedure Act ("APA") with respect to its claims alleging violations of state law.

Upon the completion of discovery, a second motion for summary judgment addressing the remaining issues in this case was filed by each party on November 22, 1988. After full briefing, oral argument on these motions was held on May 1, 1989. At the conclusion of the hearing, the Court announced its ruling from the bench. This memorandum opinion formalizes that bench ruling.

The issues addressed in the second round of summary judgment motions are as follows:

1. Whether any of McClellan's waste pits that are not covered by the facility's interim status under RCRA have handled hazardous wastes in such a way that a RCRA permit is required with respect to those units.

2. Whether McClellan has discharged toxic wastes from waste pits into navigable waters of the United States in violation of section 301 of the Clean Water Act, 33 U.S.C. § 1311.

3. Whether MESS has a cause of action under the Administrative Procedure Act with respect to its claims that McClellan has violated various state statutory and regulatory provisions relating to management of solid waste and to water pollution.

4. Whether declaratory relief is appropriate with respect to issues that the Court previously dismissed on grounds of mootness or lack of subject matter jurisdiction under the citizen suit provisions of RCRA and the Clean Water Act.

5. Whether McClellan violated various effluent limitations and receiving water standards set forth in its NPDES permits and related orders.

This memorandum opinion will address each of these issues in turn.

## I. APPLICABILITY OF RCRA PERMIT REQUIREMENTS TO McCLELLAN'S WASTE PITS

As discussed in the June 20, 1988 decision, the parts of Counts 2, 3, 4, and 5 of MESS' complaint that were not dismissed in that order involve a common question: whether McClellan is required to obtain a RCRA permit for hazardous waste units that have not actively handled hazardous wastes since permitting requirements went into effect on November 19, 1980.

■ This Court agrees with the Government that a RCRA permit is not required with respect to treatment, storage, or disposal of hazardous wastes that occurred prior to November 19, 1980. Section 3005(a) of RCRA, 42 U.S.C. § 6925(a), for example, specifically requires permits only for the management of hazardous wastes "after such date" that EPA's permit regulations take effect, *i.e.,* November 19, 1980. *See also* 53 Fed.Reg. 31,149 (Aug. 17, 1988) ("only facilities where hazardous waste is intentionally placed into land or water after November 19, 1980 require a RCRA disposal permit"); 45 Fed.Reg. 33,068 (May 19, 1980) ("[t]he Agency's intent is not to regulate under Subtitle C portions of facilities closed before the effective date of the regulations"); 45 Fed.Reg. 12,747 (Feb. 26, 1980) ("RCRA Subtitle C Regulations do not cover ... abandoned sites").[2]

The question therefore arises whether McClellan treated, stored, or disposed of wastes in its waste pits after November 19, 1980. Throughout this litigation, MESS has contended that McClellan "stores"

---

**2.** MESS' contention that the cited Federal Register notices refer only to units that were formally closed in accordance with the closure provisions in 40 C.F.R. Part 265, Subpart G, does not withstand scrutiny. Because these closure provisions were not in existence prior to November 19, 1980, EPA could not have been referring to formal closure requirements when it indicated that it did not intend to require RCRA permits for portions of facilities "closed before the effective date of the regulations." Furthermore, EPA expressly stated in its preamble of May 19, 1980 that permits were not required for inactive facilities or "inactive portions of active facilities." 45 Fed.Reg. 33,068.

wastes in these waste pits. If "storage" has in fact occurred subsequent to November 1980, then such handling of wastes would require a RCRA permit. *See Environmental Defense Fund, Inc. v. Lamphier,* 714 F.2d 331 (4th Cir.1983); *Fishel v. Westinghouse Electric Corp.,* 640 F.Supp. 442 (M.D.Pa.1986).

■ The term "storage" is defined in RCRA as "the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste." RCRA § 1004(33), 42 U.S.C. § 6903(33). EPA's implementing regulations define "storage" as "the holding of hazardous waste for a temporary period, at the end of which the hazardous waste is treated, disposed, or stored elsewhere." 40 C.F.R. § 270.2.

Here, the Government has presented uncontroverted evidence through the affidavit of Paul G. Brunner, the Deputy Director of the Environmental Management Directorate at McClellan Air Force Base, that "[w]aste placed in pits at McClellan was intended for permanent disposal" and that "[n]o disposal site at McClellan, not covered by interim status, has been used since November 19, 1980." Brunner Affidavit ¶ 7. MESS has made no attempt to refute these statements. Accordingly, this Court finds that the waste pits involved in Counts 2 through 5 of MESS' First Amended Complaint do not "store" hazardous wastes.

*Lamphier* and *Fishel* are inapposite. In each of those cases, the court found that there had been a temporary containment of materials accompanied by a subjective intent that at some time in the future there would be permanent disposal of the hazardous waste. Here, however, there was never an intent by McClellan to do anything other than make a final disposition of the waste material in question.

The only activity that has occurred at any of the inactive waste pits at McClellan since November 19, 1980 relates to the Department of Defense's Installation Restoration Program ("IRP"). *See* Exec.Order No. 12,580, 52 Fed.Reg. 2923 (Jan. 29, 1987). Furthermore, McClellan Air Force Base has been listed by EPA on the National Priorities List pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675. That listing triggered an immediate requirement that McClellan, in consultation with EPA and appropriate state authorities, commence a remedial investigation and feasibility study for the facility under CERCLA § 120(e)(1). Remedial action at the facility occurs under the direct oversight of EPA and must meet standards that are at least as stringent as those existing under RCRA. McClellan is presently negotiating a comprehensive interagency agreement with EPA pursuant to CERCLA § 120(e)(2) to govern future remedial action at the base. The remedial action that is taken must, under section 121(d)(2)(A), attain all legally applicable standards, requirements, criteria, and limitations under all federal environmental laws, specifically including RCRA, the Safe Drinking Water Act, the Clean Air Act, the Clean Water Act, and the Marine Protection, Research and Sanctuaries Act, as well as all legally applicable standards, requirements, criteria, and limitations promulgated under state environmental and federal siting laws that are more stringent than those imposed under federal law.

■ Section 121(e)(1) of CERCLA provides that "[n]o Federal, State, or local permit shall be required for the portion of any removal or remedial action conducted entirely onsite, where such remedial action is selected and carried out in compliance with this section." 42 U.S.C. § 9621(e)(1). MESS' contention that McClellan's cleanup activities are not within the scope of section 121(e) are unconvincing for the reasons set forth in the Government's Memorandum in Opposition to Plaintiffs' Second Motion for Partial Summary Judgment at 7–9.

MESS mischaracterizes the Government's reliance on CERCLA § 121(e) when it states that "Defendant claims that hazardous waste pits on the base are exempted from RCRA's notification and permit requirements by section 121(e)." MESS *Memorandum in Support of Second Motion for Partial Summary Judgment* at 16. The

Government has made it quite clear that it does not contend that section 121(e) "exempts" all activities involving treatment, storage, or disposal of hazardous wastes from RCRA permit requirements. On the contrary, where there has been treatment, storage, or disposal at a site since November 19, 1980, other than activities associated with a removal or remedial action under CERCLA, the Government acknowledges that a RCRA permit is required for that activity. Here, however, the only activity at the waste pits is in the context of remedial action taken under CERCLA. Section 121(e) expressly provides that that activity does not have to be separately permitted.

A question nevertheless remains as to whether the disposal of hazardous wastes in McClellan's waste pits requires a RCRA permit. "Disposal" is defined in RCRA as "the discharge, deposit, injection, dumping, spilling, *leaking*, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." RCRA § 1004(3), 42 U.S.C. § 6903(3) (emphasis added). MESS alleges that McClellan's waste pits require permits because they actively "leak" hazardous waste into groundwater.

Whether or not such alleged leaking constitutes handling of hazardous wastes requiring a RCRA permit appears to be an issue of first impression. The Court has not located any cases directly on point. Moreover, the legislative history and implementing regulations do not clearly state on their face whether RCRA permits are required for "leaking" from otherwise inactive disposal sites, although the term "disposal facility" is defined in 40 C.F.R. § 260.10 as "a facility or part of a facility at which hazardous waste is *intentionally* placed into or on any land or water ..." (emphasis added).

Government counsel informed the Court at the May 1, 1989 hearing, however, that EPA does not require a RCRA permit with respect to leaking associated with a disposal unit where no treatment, storage, or disposal has occurred since November 19, 1980, unless the leaked material is itself actively handled in some way. *See* 53 Fed. Reg. 31,149 (Aug. 17, 1988) (discussing this issue in detail and concluding that "only facilities where hazardous waste is intentionally placed into land or water after November 19, 1980 require a RCRA disposal permit"). EPA's position on this issue, as the agency charged with administering the RCRA permit program, is entitled to considerable deference. This Court must defer to that Agency's interpretation of RCRA unless it finds that the interpretation is in direct conflict with the express intent of Congress or is irrational. *See Chemical Mfrs. Ass'n v. NRDC*, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985); *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). This Court concludes that this approach is reasonable.

EPA has rationally construed the scope of its corrective action authorities under RCRA [3] to be broader than the scope of its permitting responsibilities. RCRA clearly establishes different scopes for these two different types of regulatory activities. The permitting program and the facility management standards in 40 C.F.R. Parts 264 and 265 are directed primarily at preventing releases of hazardous waste or constituents into the environment. The statute and EPA's regulations apply prospectively to treatment, storage, or disposal of hazardous waste that occurs after the effective date of the implementing regulations. The corrective action authorities, on the other hand, apply to releases of hazardous waste without regard to the date of any waste management activities. *See, e.g.*, section 3004(u) of RCRA, 42 U.S.C. § 6924(u) ("a permit ... shall require corrective action for all releases of hazardous waste or constituents from any solid waste

---

**3.** The corrective action provisions of RCRA include sections 3004(u), 3008(h), and 7003, 42 U.S.C. §§ 6924(u), 6928(h), and 6973. The

Government acknowledges that federal facilities are subject to these provisions.

management unit at a treatment, storage or disposal facility seeking a permit under this [statute], *regardless of the time at which waste was placed in such unit*" (emphasis added)). EPA's distinction is also logical. Where hazardous waste is being released so as to threaten human health or the environment, EPA should be empowered to take necessary measures without regard to the management status of the unit containing the waste. Preventative management standards, on the other hand, are better candidates for prospective application.

The cases cited by MESS in its reply brief are not inconsistent with EPA's approach. In both *United States v. Waste Industries, Inc.*, 734 F.2d 159 (4th Cir. 1984), and *United States v. Price*, 523 F.Supp. 1055 (D.N.J.1981), the courts held that the inclusion of leaking within the definition of "disposal" authorized EPA to take corrective action under section 7003 of RCRA, 42 U.S.C. § 6973, with respect to imminent hazards caused by such leaking. These cases did not hold that RCRA permits were required for those same episodes of leaking.

Accordingly, summary judgment will be granted in favor of the Government with respect to those parts of Counts 2, 3, 4, and 5 that were not previously dismissed.

## II. NECESSITY OF NPDES PERMIT FOR ALLEGED DISCHARGES TO GROUNDWATER

■ Count 15 of the First Amended Complaint alleges that McClellan is violating section 301 of the Clean Water Act by discharging hazardous substances from its waste pits to groundwater beneath the base without an NPDES permit. Count 18 alleges that this same activity violates state law as well.

Section 301(a) provides that in the absence of a permit, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). The term "discharge of a pollutant" is defined in section 502(12) as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The term "navigable

waters," in turn, is defined in section 502(7) as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Accordingly, section 301(a) requires permits for the addition of pollutants from point sources to waters of the United States.

The Clean Water Act does not on its face indicate whether groundwater constitutes "waters of the United States." In the June 20, 1988 opinion, this Court held that based upon the structure of the Act, its legislative history, and the relevant case law, Congress did not intend to require NPDES permits for discharges of pollutants to isolated groundwater. At the same time, this Court concluded that permits might be required for discharges to groundwater that has a direct hydrological connection to surface waters that themselves constitute "waters of the United States." 707 F.Supp. at 1196. Accordingly, the Court denied the parties' first motions for summary judgment on Count 15 and allowed additional discovery as follows:

MESS should be given the opportunity to engage in additional discovery to demonstrate a hydrological connection between the groundwater that lies below McClellan's waste pits and surface waters that themselves constitute "navigable waters." Only if MESS can show that discharges from the waste pits have an effect on surface waters of the United States can it prevail on Count 15. The mere fact that the groundwater might ultimately be consumed or might be used for irrigation purposes, as asserted by MESS, is not enough to bring the alleged discharges within the parameters of the NPDES program. Rather, MESS must establish that the groundwater is naturally connected to surface waters that constitute "navigable waters" under the Clean Water Act.

*Id.* at 1196.

Both parties subsequently retained experts for purposes of the "hydrological connection" issue. MESS' expert, Dr. Stephen K. Wheatcraft, an associate research professor at the Desert Research Institute in Reno, Nevada, submitted a report dated

September 6, 1988. The Government's expert, Dr. David Keith Todd, president of David Keith Todd Consulting Engineers, Inc. in Berkeley, California, prepared a declaration, which was submitted by the Government in support of its second motion for summary judgment. Each party also deposed the other party's expert.

Not surprisingly, the two experts do not agree on all issues. Nevertheless, there does exist some common ground upon which this Court is prepared to make certain findings of fact. First, the experts agree that groundwater under McClellan Air Force Base is naturally connected to two surface bodies of water, the American River south of the Base and the Sacramento River west of the Base. Second, the experts agree that a "cone of depression" presently exists due to heavy pumping by large consumers of groundwater, causing the groundwater in the vicinity of McClellan Air Force Base to move in a direction away from the American and Sacramento Rivers and generally toward the Base. This cone of depression has existed since at least 1968.[4] Third, the experts agree that in the absence of the cone of depression caused by heavy pumping of groundwater, groundwater beneath the Base would move generally in a southwesterly direction and some groundwater would eventually enter the American and/or Sacramento Rivers.

The parties disagree, however, as to the probability of any dissipation of the cone of depression in the vicinity of McClellan Air Force Base and the imminence and nature of any effects on surface waters if the cone of depression were to disappear. MESS contends that the cone of depression is "localized, temporary and artificial," Wheatcraft Report at 2, and that groundwater will soon reverse directions and flow once again into surface waters. The Government, on the other hand, contends that there is no basis to believe that there will be any reversal in the direction of groundwater flow in the foreseeable future, and that even assuming that the cone of depression were to suddenly disappear, it would take literally dozens, and perhaps hundreds, of years for any pollutants in the groundwater to reach surface waters.

Based upon the parties' submissions, the Court finds that McClellan's waste pits do not presently discharge pollutants to the American River or the Sacramento River and have not done so since at least 1968, four years prior to the effective date of section 301 of the Clean Water Act. However, the Court is not ready to rule as a matter of law that an NPDES permit is not required for any discharges from the waste pits into groundwater.

The purpose of the Clean Water Act, of course, is to restore and maintain the integrity of our waterways. In view of that broad purpose, this Court is very much concerned that if it were to grant summary judgment in favor of the Government at this time, it might inadvertently send out a signal that even where there is a natural hydrological connection between groundwater and surface waters, a manmade or artificially created process that temporarily interrupts that hydrological connection can serve to negate the permitting requirements of the Clean Water Act. Accordingly, the Court has determined that MESS should have the opportunity to demonstrate through expert testimony that any seepage of pollutants from McClellan's waste pits into groundwater has a reasonably foreseeable and temporally imminent effect on surface waters of the United States.

Aside from the possible connection between the deep groundwater under McClellan Air Force Base and the American and Sacramento Rivers, MESS also alleges that pollutants from McClellan's waste pits are being discharged via a near-surface unsaturated zone into creeks that cross the Base. This allegation is based primarily on an eyewitness account by MESS' expert of "evidence of seepage from the near-surface unsaturated zone into the drainage canals in several places." Wheatcraft Report at 6. The Government counters that even if

---

**4.** Dr. Wheatcraft conceded during his deposition that there has been no flow of groundwater from beneath the Base into the rivers since at least 1968. Wheatcraft Deposition at 62, 66–67. Dr. Todd dates the cone of depression from at least 1965. Todd Declaration ¶¶ 1–2.

such seepage exists, MESS has failed to make even a *prima facie* case that any pollutants from waste pits on the Base are being discharged into surface waters. In this regard, the Government has submitted affidavit testimony that the alleged locations of the seeps are both too near the surface and too far away from McClellan's waste sites to contain any contaminants from those sites.

This Court is of the opinion that MESS has presented sufficient evidence to survive a dismissal of its claim that McClellan is violating the Clean Water Act by allegedly discharging pollutants from waste pits through the near-surface unsaturated zone to the creeks that cross the Base. Because this issue ultimately turns on the facts, the Court believes that it is appropriate to give MESS an opportunity to present its case through testimony at a trial. However, as the plaintiff in this matter, MESS shall have both the burden of presenting evidence and the ultimate burden of persuasion that groundwater is being discharged to surface waters and that such groundwater contains contaminants from McClellan's waste pits.

In view of these determinations, both parties' motions for summary judgment on Count 15 and the related part of Count 18 of the complaint will be denied.

### III. APA CLAIMS

As previously discussed, subsequent to this Court's dismissal of MESS' claims based upon state law at the conclusion of the February 8, 1988 hearing on the first round of summary judgment motions, MESS moved for leave to file an amended complaint that alleged an additional cause of action based upon the judicial review provisions of the APA, 5 U.S.C. §§ 702 *et seq.* The Court granted that motion in an order dated March 31, 1988. MESS' claims under the APA apply to all counts of the complaint that allege violation of state law, specifically, Counts 6, 8, 9, 10, 11, 16, 17, 18, 19, 20, and 21.

The Government challenges MESS' APA claims on three separate procedural grounds: (i) the Court lacks jurisdiction under 28 U.S.C. § 1331 to review agency action that is alleged to violate state law; (ii) MESS lacks standing to raise claims under the APA because it has failed to demonstrate that it has incurred an injury-in-fact resulting from McClellan's purported failure to comply with state law; and (iii) MESS has failed to state a cause of action under the APA because the actions that MESS challenges do not constitute "agency action" within the meaning of the APA. In the alternative, the Government contends that MESS' state law claims should be denied on the merits.

This Court concludes that MESS has standing under the APA and that the Court has jurisdiction under 28 U.S.C. § 1331. However, the Court agrees with the Government that MESS has failed to allege a proper cause of action under the APA, and therefore Counts 6, 8, 9, 10, 11, 16, 17, 18, 19, 20, and 21 will be dismissed. Because those counts are being dismissed on procedural grounds, it is not necessary to reach the merits of MESS' allegations that McClellan has violated state law.

█ Of the three procedural challenges raised by the Government, the Court finds that the argument regarding standing is the easiest to resolve. After the Government questioned the plaintiffs' standing in its second motion for summary judgment, MESS submitted affidavits executed by two of the individual plaintiffs. Those affidavits allege personal and financial harm resulting from McClellan's activities involving disposal of hazardous wastes and discharges to surface waters. The Court concludes that these allegations are sufficient to establish "injury in fact" under Article III of the United States Constitution. *See Port of Astoria, Or. v. Hodel,* 595 F.2d 467, 474 (9th Cir.1979).

█ Much more troublesome is whether this Court has subject matter jurisdiction to review alleged violations of state law. As the Supreme Court has held, the APA does not itself provide jurisdiction. *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977). *See Oregon Natural Resources Council v. United*

*States Forest Service ("ONRC")*, 834 F.2d 842, 852 n. 16 (9th Cir.1987). Consequently, jurisdiction must be based upon some other statute. Here, MESS alleges that federal question jurisdiction exists under 28 U.S.C. § 1331.[5] That statute provides:

> The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

On its face, 28 U.S.C. § 1331 provides district courts with jurisdiction only with respect to civil actions that arise under *federal* law. The Government contends that Counts 6, 8, 9, 10, 11, 16, 17, 18, 19, 20, and 21 all arise under *state* law and therefore this Court lacks subject matter jurisdiction to render any relief with respect to those claims. MESS, on the other hand, contends that these claims arise under the federal facilities provisions of RCRA and the Clean Water Act, which provide generally that federal agencies engaged in solid waste management or discharges of pollutants are subject to state requirements.

The Court is inclined to agree with the Government's position but feels compelled by the Ninth Circuit's decision in *ONRC* to conclude that subject matter jurisdiction does exist here. In *ONRC*, an environmental organization sought to enjoin a timber company from harvesting timber pursuant to a sale awarded the company by the United States Forest Service ("USFS"). One aspect of the environmentalists' claim was that road building and timber harvesting associated with the timber sale allegedly violated Oregon state water quality standards and that USFS's alleged failure to comply with those standards violated the federal facilities provision of the Clean Water Act, 33 U.S.C. § 1323. 834 F.2d at 848. One of the issues before the Ninth Circuit was whether plaintiff's claim could be brought under either the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365, or the APA. The Government argued that the claim was improper on either basis. Specifically, with respect to the citizen suit provision, the Government maintained that the plaintiff had failed to provide the required sixty-day notice, 33 U.S.C. § 1365(b)(1), or, in the alternative, that the state water quality standards were not "effluent standard[s] or limitation[s]" as defined in the citizen suit provision, 33 U.S.C. § 1365(f). With respect to the APA, the Government argued that by enacting the citizen suit provision, Congress had intended to preclude actions under the APA alleging violations of the Clean Water Act.

The Ninth Circuit agreed with the Government that the citizen suit provision did not provide ONRC with a cause of action to challenge the Oregon water quality standards. Specifically, the Court held that those water quality standards were not "effluent standards or limitations" to the extent that they applied to "nonpoint" sources of discharges. 834 F.2d at 848–50. The Court went on to determine, however, that ONRC could challenge the alleged state water quality standard violations from nonpoint sources under the APA. In this regard, the Court concluded that the Clean Water Act citizen suit provision precluded remedies under other statutes only with respect to limitations and standards

---

5. MESS has also alleged that jurisdiction exists under the citizen suit provisions of RCRA, 42 U.S.C. § 6972(a), and the Clean Water Act, 33 U.S.C. § 1365. This Court held in the June 20, 1988 decision, however, that MESS' state law claims do not fall within the scope of the citizen suit provisions. Specifically, the Court held that it lacks jurisdiction under the RCRA citizen suit provision with respect to Counts 6, 8, 9, 10, and 11 because those counts involve obligations that did not "become effective pursuant to [RCRA]." 707 F.Supp. at 1191. Similarly, the Court held that it lacks jurisdiction under the Clean Water Act citizen suit provision with respect to Counts 16, 17, 19, 20, and 21 because those counts do not involve "effluent standards or limitations."

*Id.* at 1197. The only claim based upon state law with respect to which this Court did not previously hold that it lacks jurisdiction under the citizen suit provisions is Count 18. However, for the very reason that relief is potentially available under the citizen suit provision, relief under the APA with respect to Count 18 is precluded. *See Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Allegheny County Sanitary Authority v. United States Environmental Protection Agency*, 732 F.2d 1167, 1177 (3d Cir.1984); *City of Las Vegas, Nev. v. Clark County, Nev.*, 755 F.2d 697, 703 (9th Cir. 1985); *ONRC*, 834 F.2d at 851–52.

that were enforceable under the citizen suit provision. 834 F.2d at 850–52. In other words, if the citizen suit provision does not provide a cause of action to a plaintiff, then other statutory bases for relief, such as the APA, continue to exist. Conversely, if relief is available under the citizen suit provision, then that relief is exclusive.

The Court's only reference in *ONRC* to subject matter jurisdiction occurred in a footnote, where the Court stated that "[f]ederal question jurisdiction is based on 28 U.S.C. § 1331." 834 F.2d at 852 n. 16. Apparently, the Government did not make the argument in *ONRC* that it makes here that allegations of violations of state law do not raise federal questions justiciable under 28 U.S.C. § 1331, nor did the Court address that issue *sua sponte.* In this case, the Government seeks to distinguish the court's assertion of jurisdiction in *ONRC* on the basis that the Ninth Circuit was of the view that the state water quality standards arose under federal law. While some support for that position can be found in *ONRC, see* 834 F.2d at 848, this Court is unwilling to make that inference about the Ninth Circuit's thought process.

Simply put, although it is prone to agree with the Government that federal question jurisdiction does not exist where violations of state law are alleged, this Court is not prepared to hold that subject matter jurisdiction does not exist in this case when the Court of Appeals for this Circuit has asserted such jurisdiction in similar circumstances. Rather, the Court of Appeals is the more appropriate forum for resolving this troublesome issue. In coming to this conclusion, this Court is mindful that the June 20, 1988 decision specifically rejected MESS' contention that its state claims "arose under" the federal facilities provisions of RCRA and the Clean Water Act. 707 F.Supp. at 1191 n. 2. Similarly, were it not for *ONRC,* this Court would confidently hold that MESS' state law claims involve state law only and therefore there is no federal question subject matter jurisdiction under 28 U.S.C. § 1331. But this Court cannot simply ignore *ONRC.*

In any event, the Court does hold that MESS has failed to state a cause of action under the APA because the activities at McClellan Air Force Base that MESS challenges here do not constitute "agency action" as defined in the APA. The term "agency action" is defined at 5 U.S.C. § 551(13) as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." Here, MESS has indicated that the "agency action" that it is challenging consists of McClellan's alleged "failure to act" to comply with applicable state laws.

MESS obviously views an agency's "failure to act" as a class of agency action that is subject to judicial review under the APA no matter what the agency has failed to act upon. Under this theory, any omission by a government agency would be subject to judicial review. That position, however, is at odds with both the scope and purposes of the APA.

As its title indicates, the Administrative Procedure Act applies to administrative procedures, not to the day-to-day operations of a federal facility. Indeed, the definition of "agency action" refers to rules, orders, licenses, sanctions, and relief, all of which are administrative matters. Thus, common sense alone suggests that the phrase "failure to act" in 5 U.S.C. § 551(13) refers to a failure to promulgate a rule, to issue an order, to grant a license, to impose a sanction, or to provide relief. There is simply no reasonable basis to think that Congress intended that affirmative agency actions be subject to review only if they involve administrative matters but that omissions to act be subject to review regardless of their context.

Two rules of statutory construction support the interpretation of the term "failure to act" as applying only to administrative matters. The first rule, known as *noscitur a sociis,* provides:

> If the legislative intent or meaning of a statute is not clear, the meaning of doubtful words may be determined by reference to their relationship with other associated words and phrases. Thus,

when two or more words are grouped together, and ordinarily have a similar meaning, but are not equally comprehensive, the general word will be limited and qualified by the special word.

2A *Sutherland Statutory Construction* § 47.16 (4th ed. 1984) (footnotes omitted). A related maxim, known as *ejusdem generis,* provides:

Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.

*Id.* § 47.17 (footnotes omitted). *See Nevada v. Herrington,* 827 F.2d 1394, 1400 (9th Cir.1987); *United States v. Bottoms,* 755 F.2d 1349, 1350 (9th Cir.1985). Under these principles of statutory construction, the phrase "failure to act" in the definition of "agency action" must be read to refer to the same kind of actions specifically enumerated, *i.e.,* administrative actions.

In *ONRC,* the Ninth Circuit did not specifically address whether the action being challenged constituted an "agency action" within the meaning of 5 U.S.C. § 702. However, the action there was the reoffer of a timber sale by the United States Forest Service pursuant to 16 U.S.C. § 618(a)(5)(A). 834 F.2d at 845. Such a timber sale could constitute a "license" as defined in 5 U.S.C. § 551(8). Moreover, the Court in *ONRC* concluded that the reoffer constituted a "decision" within the meaning of 36 C.F.R. § 211.18(f)(1), which gave the plaintiff a right of administrative appeal. 834 F.2d at 846. The Forest Service's determination on that appeal could constitute an "order" as defined in 5 U.S.C. § 551(6).[6]

Here, in sharp contrast, the "failure to act" that MESS is attempting to challenge under the APA is completely devoid of any of the characteristics of administrative procedure that are so clearly part of an agency rule, order, license, sanction, or relief.

The Court also notes the very different natures of the mandates of administrative agencies and the Department of Defense. The overriding purpose of the Defense Department is to preserve the peace, security, and integrity of the United States, not to make administrative decisions. The Air Force in particular must stand ready to overcome any aggressive act against the United States by foreign powers. Federal facilities are clearly subject to state-imposed requirements that fall within the scope of the federal facilities provisions of RCRA and the Clean Water Act. Moreover, the United States may be subject to the citizen suit provisions of those statutes for allegedly violating some of those requirements. However, this Court finds no evidence that Congress ever intended that McClellan's day-to-day activities as a *regulated* entity—as opposed to a *regulating* entity—be reviewable under the APA.

Accordingly, this Court concludes that MESS has failed to state a cause of action under the APA, and all the counts in the complaint alleging violation of state law, except Count 18, will be dismissed.[7]

## IV. AVAILABILITY OF DECLARATORY RELIEF

In the June 20, 1988 decision, this Court dismissed several portions of MESS' complaint on mootness grounds (Counts 2 and 4 to the extent that they involve cooling

---

**6.** Similarly, the agency action challenged in *Parola v. Weinberger,* 848 F.2d 956 (9th Cir.1988), was the awarding of a procurement contract, a form of "license," for which the Ninth Circuit stated that "judicial review ... is well established." *Id.* at 959.

**7.** MESS has no APA cause of action with respect to Counts 16, 17, 19A, and 21 for an additional reason as well. MESS seeks relief under 5 U.S.C. § 706 that would compel agency action "unlawfully" withheld and set aside agency action that is "not in accordance with law" or that is without observance of procedure "required by

law." Obviously, if a particular law is not applicable to a defendant, a court cannot order the defendant to comply with that law under the APA. Here, the Court held in the June 20, 1988 decision that the state statutes and regulations involved in Counts 16, 17, 19A, and 21 are not "requirements" and therefore are not applicable to federal facilities pursuant to section 313 of the Clean Water Act, 33 U.S.C. § 1323. 707 F.Supp. at 1198. Accordingly, McClellan could not have acted unlawfully with respect to those state provisions and MESS has no basis for relief under the APA.

towers, Count 12, Count 14, and Count 18 to the extent that it relates to stormwater) or for lack of subject matter jurisdiction under section 505 of the Clean Water Act, 33 U.S.C. § 1365, because they involved allegations of violations that occurred entirely in the past (Count 12 and Count 13). The Court indicated, however, that it was dismissing these causes of action only with respect to injunctive relief. The Court left open the possibility that it would consider declaratory relief at a later time, and requested that the parties submit briefs on the issue of whether declaratory relief is appropriate. 707 F.Supp. at 1188. The Court now concludes that declaratory relief is not appropriate, for precisely the same reasons that injunctive relief is not appropriate.

The Declaratory Judgment Act requires that there be "a case of actual controversy" before declaratory relief can be granted by a court of the United States. 28 U.S.C. § 2201(a). The Ninth Circuit has held that declaratory relief should be denied " 'where it would serve no useful purpose.' " *McGraw–Edison Co. v. Preformed Line Products Co.*, 362 F.2d 339, 342–43 (9th Cir.) (citation omitted), *cert. denied*, 385 U.S. 919, 87 S.Ct. 229, 17 L.Ed.2d 143 (1966). That Court has recently stated:

> The question we must address is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

*Central Montana Electric Power Cooperative v. Administrator of Bonneville Power Admin.*, 840 F.2d 1472, 1474 (9th Cir. 1988) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)). Thus, "[t]here is no longer an actual controversy, and a declaratory judgment cannot be given, if a matter has become moot." 10A C. Wright, A. Miller & M.

Kane, *Federal Practice & Procedure* § 2757, at 602 (2d ed. 1983). *See Enrico's Inc. v. Rice*, 730 F.2d 1250, 1255 (9th Cir. 1984) ("The same events that have mooted injunctive relief, persuade us that the case is also moot for purposes of declaratory relief....").

In addition to requiring an actual case or controversy, "[t]he Declaratory Judgment Act does not provide an independent jurisdictional basis for suits in federal court." *Fiedler v. Clark*, 714 F.2d 77, 79 (9th Cir. 1983) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–74, 70 S.Ct. 876, 878–80, 94 L.Ed. 1194 (1950)). Rather, that Act "only permits the district court to adopt a specific remedy when jurisdiction exists." 714 F.2d at 79. Moreover, "[i]f the court would lack jurisdiction of a coercive action against the United States because of sovereign immunity, it is equally without jurisdiction of a declaratory action against the United States." 10A C. Wright, A. Miller, & M. Kane, *supra*, § 2766, at 737. *See Covington County Bank v. R.J. Allen & Associates*, 389 F.Supp. 415, 416 (M.D.Ala.1975) (the Declaratory Judgment Act "provides no waiver of sovereign immunity").

Based upon these principles, it is clear that this Court cannot render declaratory relief with respect to MESS' claims that were previously dismissed for purposes of injunctive relief.

Counts 12 and 13 were previously dismissed for lack of subject matter jurisdiction. Because no separate jurisdictional basis exists for purposes of declaratory relief, this Court's prior determination that it lacks subject matter jurisdiction necessarily applies to declaratory relief as well as injunctive relief.

Similarly, the same circumstances that led the Court to hold that portions of Counts 2, 4, and 18 and all of Counts 12 and 14 are moot with respect to injunctive relief make declaratory relief moot as well.[8] Declaratory relief with respect to

---

**8.** Portion of Counts 2 and 4 were found to be moot because McClellan "has not used treated wastewater in the cooling towers for nearly two years [and] [t]here is simply no reason to believe that McClellan has any intention of using treated wastewater in the cooling towers any time in the future." 707 F.Supp. at 1188. Count 12 was found to be moot because

these causes of action " 'would serve no useful purpose.' " 362 F.2d at 343 (citation omitted). As this Court found in the June 20, 1988 decision, it is uncontested that there are no current violations at McClellan with respect to these counts and no reasonable expectation that there will be any violations in the future. Furthermore, even if MESS were to demonstrate that violations had occurred in the past, "there is no effective remedy this court can fashion for plaintiff." 730 F.2d at 1255. In short, "[t]here simply does not exist a substantial controversy 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Id.* (quoting *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974), and *Maryland Casualty Co.*, 312 U.S. at 273, 61 S.Ct. at 512).

Accordingly, the counts of the First Amended Complaint that were previously dismissed for purposes of injunctive relief but not declaratory relief will now be dismissed in their entirety.

## V. NPDES ALLEGATIONS

Count 23 of the First Amended Complaint alleges that McClellan has violated various limitations set forth in its NPDES permits and related orders. These allegations involve two types of limitations: (i) effluent limitations, which regulate the amount or concentration of particular pollutants that may appear in McClellan's discharges; and (ii) receiving water standards, which limit the extent to which McClellan's discharges may change the quality of receiving waters. Unlike exceedances of effluent limitations, where McClellan's discharge monitoring reports may establish *per se* violations, exceedances of receiving water standards constitute violations only if McClellan's discharges actually *caused* the exceedances.

In the June 20, 1988 decision, this Court dismissed a large portion of Count 23 on the grounds that MESS had failed to mention the relevant allegations in its notice of intent to sue, as required by section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b). The allegations that were dismissed related to total suspended matter, suspended solids, lead, temperature, turbidity, chlorine, and total cyanide, and to a lesser extent, chemical oxygen demand, pH, and bioassay. For different reasons, the Court dismissed allegations involving the period prior to July 1, 1985 relating to the effluent limitation for chemical oxygen demand in cooling water discharges and the receiving water standard for phenol. The Court, however, granted summary judgment in favor of MESS with respect to certain violations of effluent limitations for chemical oxygen demand, pH, and bioassay that were admitted by the Government. The Court made no ruling with respect to the remaining allegations in Count 23.

The Government argues in its second motion for summary judgment that MESS' allegations relating to the effluent limitation for chemical oxygen demand for the period from July 1, 1985 through August 8, 1986 should be denied because no limitation was in effect during that period. In a supplemental brief filed shortly before the May 1, 1989 hearing in this matter, MESS conceded that the Government's position is correct. Accordingly, it is now appropriate to dismiss that part of Count 23 that alleges violations of the effluent limitation for chemical oxygen demand for the period July 1, 1985 through August 8, 1986.

In addition, the June 20, 1988 decision did not address alleged violations of (i) effluent limitations for total coliform, phenol, and bioassay (except for those bioassay violations conceded by the Government or not mentioned in MESS' notice of intent to sue), and (ii) receiving water standards for pH and phenol. The Government maintains that these allegations are now moot because McClellan's present NPDES per-

---

"McClellan now sends all of its domestic and industrial wastewater directly to the County waste treatment facility and no longer discharges any such wastewater to surface waters." *Id.* at 1192. Count 14 and part of Count 18 were found to be moot because McClellan's most recent NPDES permit expressly encompasses stormwater and because permits for industrial discharges consisting entirely of stormwater are not presently required. *Id.* at 1193, 1201.

mit does not regulate these pollutants.[9] MESS responds that even if these allegations are moot with respect to injunctive relief, the Court should nevertheless grant declaratory relief. The Court finds, however, that it is "absolutely clear" that McClellan will not commit any future violations of effluent limitations or receiving water standards that are no longer included in its NPDES permit. *See Gwaltney v. Chesapeake Bay Foundation*, 484 U.S. 49, 66, 108 S.Ct. 376, 386, 98 L.Ed.2d 306 (1987). This conclusion is bolstered by the fact that McClellan no longer discharges any industrial wastewater, domestic wastewater, or cooling waters to surface waters. For the reasons discussed earlier, this finding of mootness applies with respect to both injunctive and declaratory relief. Accordingly, the alleged violations appearing in Count 23 involving effluent limitations for total coliform, phenol, and bioassay and receiving water standards for phenol and pH are dismissed.

As previously discussed, the June 20, 1988 decision granted summary judgment in favor of MESS with respect to certain allegations regarding the effluent limitation for pH that were admitted by the Government and it dismissed certain allegations that were not identified in MESS' notice of intent to sue. The Court has now learned of six additional exceedances that were inadvertently omitted from the Government's admissions. Those exceedances of the pH limitation occurred on January 31, 1984 from discharge points CW–2, CW–3, and CW–4; on March 11, 1984 from CW–5; and on August 8, 1982 and June 4, 1985 from outfall 002. Accordingly, summary judgment will be granted in favor of MESS with respect to these six allegations.

Finally, Count 23 alleges that McClellan violated the receiving water standard for dissolved oxygen. In the first round of summary judgment motions, the Govern-

ment argued that McClellan's permits make it clear that exceedances of receiving water standards constitute violations only if McClellan's discharges actually cause the change in water quality. For example, the NPDES permits provide that McClellan's discharges may not cause the concentration of dissolved oxygen in receiving waters to fall below 5.0 mg/l. This Court agreed with the Government and therefore denied MESS' motion for summary judgment with respect to receiving water standards so that "the Government will have an opportunity to develop and present evidence showing that its discharges did not cause the exceedances of receiving water standards." 707 F.Supp. at 1204.

In the second round of summary judgment briefs, the Government attempts to meet the burden established by the June 20, 1988 decision by comparing the quality of surface waters coming onto McClellan Air Force Base to the quality of receiving waters after McClellan's discharges were added. With respect to 26 of the 107 separate violations of the receiving water standard for dissolved oxygen alleged in Count 23, which cover the period January 15, 1981 through October 3, 1985, the Government contends that McClellan's discharge monitoring reports indicate that dissolved oxygen in the receiving waters was less than 5.0 mg/l *before* McClellan's discharges were added. On many of these occasions, the Government notes, McClellan's discharges actually improved the concentration of dissolved oxygen in the receiving waters. The Government therefore specifically denies these 26 allegations. With respect to ten other allegations, the Government concedes that McClellan's discharge monitoring reports indicate that its discharges did in fact cause the concentration of dissolved oxygen to fall below 5.0 mg/l. The Government therefore admits that violations occurred on these dates.[10] The

---

9. McClellan's present NPDES permit applies only to discharges of cooling waters and stormwater and regulates only chemical oxygen demand, temperature, and pH.

10. The violations admitted occurred on January 10, April 4, April 18, April 23, and April 25, 1985

at Second Creek; on October 24, 1983 and September 12, 1984 at Magpie Creek; and on July 16, July 18, and July 23, 1985 at Arcade Creek. The Government specifically denies that a violation occurred on June 4, 1985 at Arcade Creek, as alleged by MESS, on the grounds that there was no discharge to Arcade Creek on that date.

Government points out that the remaining alleged violations occurred prior to the time that McClellan started monitoring the water quality of surface waters where they entered the Base. Nevertheless, the Government generally denies these allegations based upon the subsequent data indicating that McClellan's discharges usually were not the proximate cause of dissolved oxygen levels falling below 5.0 mg/l. MESS challenges the validity of McClellan's monitoring practices because they did not necessarily measure the same molecules of water before and after McClellan's discharges were added.

This Court concludes that the proximate cause of the exceedances of the receiving water standard for dissolved oxygen between January 15, 1981 and October 3, 1985 is a triable issue of fact. Accordingly, the Court denies both parties' summary judgment motions on this portion of Count 23.[11]

IT IS THEREFORE ORDERED THAT:

Based upon the above analysis, the Court decides the second set of motions for summary judgment as follows:

| Count | Order |
| --- | --- |
| 2 | Government motion granted; MESS motion denied. |
| 3 | Government motion granted; MESS motion denied. |
| 4 | Government motion granted; MESS motion denied. |
| 5 | Government motion granted; MESS motion denied. |
| 6 | Government motion granted; MESS motion denied. |
| 8 | Government motion granted; MESS motion denied. |
| 9 | Government motion granted. |
| 10 | Government motion granted; MESS motion denied. |
| 11 | Government motion granted. |
| 12 | Government motion granted; MESS motion denied. |
| 13 | Government motion granted; MESS motion denied. |
| 14 | Government motion granted; MESS motion denied. |
| 15 | Government motion denied; MESS motion denied. |
| 16 | Government motion granted. |
| 17 | Government motion granted. |
| 18 | Government motion granted with respect to declaratory relief for stormwater discharges; Government motion denied with respect to discharges to groundwater; MESS motion denied. |
| 19 | Government motion granted. |
| 20 | Government motion granted. |
| 21 | Government motion granted. |
| 23 | Government motion granted with respect to alleged violations of effluent limitation for chemical oxygen demand for the period July 1, 1985 through August 8, 1986; Government motion granted with respect to alleged violations of effluent limitations for total coliform, phenol, and bioassay (except for bioassay allegations for which summary judgment was previously granted in favor of MESS); Government motion granted with respect to alleged violations of receiving water standards for pH and phenol; Government motion denied with respect to alleged violations of receiving water standard for dissolved oxygen; MESS motion denied except with respect to alleged violations of effluent limitation for pH specifically admitted by the Government and to alleged violations of receiving water standard for dissolved oxygen. |

**11.** The parties have informed the Court that they have agreed to the general terms of a settlement with respect to the dissolved oxygen issue and hope to formalize that agreement. In view of the Court's resolution of all other allegations in Count 23, it will not be necessary to address Count 23 at trial if the parties are able

to reach an agreement with respect to the receiving water standard for dissolved oxygen.