USG CORPORATION, a Delaware corporation; and USG Interiors, Inc., a Delaware corporation, Plaintiffs,

v.

Donald A. BROWN, an individual; Donald A. Brown, as trustee of the Revocable Living Trust dated September 29, 1976; and Manufacturers National Bank of Detroit, as trustee of the Irrevocable Trust dated July 22, 1976, Defendants.

No. 89 C 2874.

United States District Court,
N.D. Illinois, E.D.

Oct. 26, 1992.

James J. Casey, Michael J. Dolesh, Keck, Mahin & Cate, Robert Wayne Hallock,

D'Ancona & Pflaum, Chicago, IL, for plaintiffs.

Robert E. Graziana, Robert D. Watkins, Marco, Eagan, Kennedy & Timmis, Grosse Pointe, MI, for Donald A. Brown, Revocable Living Trust Dated September 29 1976.

Janet Lynn Reed, Alan Norris Salpeter, Mayer, Brown & Platt, Chicago, IL, Robert E. Graziana, Robert D. Watkins, Marco, Eagan, Kennedy & Timmis, Grosse Pointe, MI, for Manufacturers Nat. Bank of Detroit.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

In this diversity case, plaintiffs USG Corporation and USG Interiors, Inc. (USG) seek indemnification from defendants (Brown), pursuant to a merger agreement, for costs incurred as a result of alleged violations of environmental laws and regulations prior to the merger date. Before us now is USG's motion for summary judgment on the issue of liability under Article 4(d) of the indemnity agreement. For the reasons below, we grant in part and deny in part USG's motion for summary judgment.

### BACKGROUND [1]

Prior to February 25, 1986, defendants owned D.A.B. Holding Company, the parent of Donn Corporation (Donn) and American Metals Company (AMC).[2] Both Donn and AMC have manufacturing plant facilities on a site in Westlake, Ohio (Westlake site).

On February 25, 1986, USG and Brown agreed to a merger of D.A.B. into USG Interiors, Inc., a subsidiary of USG Corporation. The official merger date was April

---

1. A grant of summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Renovitch v. Kaufman,* 905 F.2d 1040, 1044 (7th Cir.1990). The movant has the burden of demonstrating a lack of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In making this determination, we examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," resolving all doubts in favor of the non-movant. Fed. R.Civ.P. 56(c). For that purpose we are "not required to draw every conceivable inference from the record—only those inferences that are reasonable," in favor of the non-movant. *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). The facts recited reflect the above standard.

2. Throughout this opinion we will refer to defendants when we mean pre-merger AMC or Donn, or when we mean defendants currently.

9, 1986. As part of the merger, USG and Brown executed an indemnity agreement providing for defendants to indemnify USG under certain conditions for expenses related to any pre-merger noncompliance with environmental laws or regulations.

As part of the manufacturing process at the Westlake site certain waste was produced. The Westlake site has had a variety of arrangements for the purpose of storing and disposing of waste. Sludge was deposited in a sludge-drying pond until the mid- to late 1960s, when AMC decided to build a new building on the site of the sludge-drying pond. The pond was covered over with dirt and a building was built on top of the old pond. Defendants built a settling basin, a landfill and three surface impoundments to replace the sludge-drying pond as waste disposal and storage areas. The settling basin was also constructed in the mid- to late 1960s and was used to allow water to be separated from any excess sludge. AMC stopped using the settling basin in 1972. The landfill was created during construction of new buildings on the Westlake site as a source of dirt. It was also used until about 1974 to hold sludge from the surface impoundments that was not drying fast enough for off-site disposal. Because of changes in its waste storage and disposal practices, AMC no longer needed or used the surface impoundments as of about 1982. In 1982 AMC removed sludge from the surface impoundments and had it hauled off-site.

The U.S. Environmental Protection Agency (USEPA) initiated an administrative proceeding against AMC on January 4, 1989. The proceeding was brought pursuant to Section 3008(a)(1) of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6928(a)(1). The EPA proceeding concerned alleged RCRA violations with respect to the surface impoundments. The USEPA proposed a civil penalty of $69,555 for the RCRA violations. On February 22, 1990, AMC (with USG's approval) entered into a consent order with the USEPA (Order I), under which AMC agreed to perform certain actions to bring the Westlake facility into compliance with applicable hazardous waste laws, including instituting a

groundwater monitoring program. Also as part of Order I, USG negotiated and paid a lower penalty of $45,000.

The USEPA also initiated a corrective action proceeding against AMC on March 13, 1990 (Order II). Order II had as its purpose for AMC

(1) to perform a RCRA Facility Investigation (RFI) to determine fully the nature and extent of any release of hazardous wastes and hazardous constituents at or from the Facility; and (2) to perform a Corrective Measures Study (CMS) to identify and evaluate alternatives for the corrective action, if necessary, to prevent or mitigate any migration or releases of hazardous wastes or hazardous constituents at or from the Facility.

Order II (plfs' ex. 4).

USG seeks a declaratory judgment on liability requiring defendants to indemnify USG for any pre-merger noncompliance with environmental laws and for resulting costs from Orders I and II "regardless of when such loss, liability, or expense ... is incurred or assessed."

## DISCUSSION

### The Indemnity Agreement

Because this is a breach of contract action, we must first examine the provisions of the indemnity agreement. Both sides agree that, per the provisions of the indemnity agreement, Ohio law governs. The indemnity agreement provided that defendants

shall indemnify and hold harmless USG ... with respect to any loss, liability or expense ... incurred in connection with: ... (d) any noncompliance prior to the Merger Date (whether noticed, cited or otherwise) with applicable environmental laws, ordinances, and regulations, including, but not by way of limitation, the Federal Water Pollution Control Act, the Federal Clean Air Act, the Federal Resource Conservation and Recovery Act, and any state or local counterpart of any of the above laws, and any regulations issued under any of the foregoing; (e) any expenditures, incurred on a basis

consistent with USG's past practice, for clean-up of hazardous substances or environmental restoration of any waste disposal site used ... with respect to such use prior to the Merger Date.

(Article 4, Indemnity Agreement ("Article 4")). USG, recognizing that resolution of claims under section (e) of Article 4 will probably involve factual determinations not appropriate on a motion for summary judgment, has limited its motion to section (d) of Article 4. USG's section (d) claims stem from post-merger USEPA action taken against USG; USG maintains that the costs it has incurred because of two USEPA orders are due to pre-merger noncompliance by the defendants.

Other provisions of the indemnity agreement involve notice requirements (Article 6), limitation periods (Article 7), liability limitations (Article 8), the right of defendants to assume the defense of certain matters and the obligations of the parties with respect to settlements (Article 12).[3] Also, Article 13 describes the acceptable forms for notice under the agreement.

3. Article 6 provides that USG shall give defendants

> prompt written notice of any claims, demands, causes of action, suits, proceedings, judgments, costs or expenses subject to the provisions of Article 4.

Article 7 provides that defendants shall not

> have any obligation or be subject to any claim under Article 4 ... unless written notice of such obligation or claim is given to [defendants] on or before the third anniversary of the Merger Date.

Article 8 provides that defendants shall not be liable for the first $100,000 "in the aggregate with respect to losses, liabilities or expenses for which, but for this Article 8, [defendants] would otherwise be liable under Article 4.

Article 12 provides that

> Upon receipt of notice of any claim, demand, cause of action, suit, proceeding, judgment, cost or expense pursuant to Article 6..., [defendants] may elect, by written notice to [USG], to assume the defense of such matter at [defendants' expense and by defendants' counsel].

Article 12 provides further that neither defendants nor USG

> shall settle, compromise, or resolve, by payment or otherwise, any potential loss, liability, or expense covered by Article 4 ... without the prior consent of the other, which consent shall not be unreasonably withheld.

USG claims that as a result of USEPA investigations of the Westlake facility both before and after the merger, the USEPA entered two orders against USG. USG seeks a declaratory judgment of liability based on defendants' alleged pre-merger noncompliance with various environmental laws and resulting costs attributable to the two EPA orders.[4]

Defendants respond with numerous legal arguments and representations as to why summary judgment is inappropriate. Defendants maintain that plaintiffs cannot recover because they did not incur a "loss, liability or expense" within the limitation period provided by Article 7. Defendants also deny that plaintiffs complied with the requirements for proper and timely notice under the indemnity agreement. Also, defendants claim that plaintiffs have not demonstrated the lack of a genuine issue of material fact concerning defendants' noncompliance prior to April 9, 1986. Finally, defendants deny that USG has demonstrated a causal connection between any alleged violations and the entry of the two EPA orders.

4. Specifically, USG claims damages from the following pre-merger violations:

> a) failure to follow applicable regulations regarding the filing of the Notification of Hazardous Wastes and the Part A Permit (Interim Status) application (40 CFR Part 270 and Ohio Administrative Code ("OAC") § 3745–50–40 et seq.);
> b) failure to follow applicable regulations regarding closure of the surface impoundments (40 CFR § 265.110 et seq. and OAC § 3745–66–10 et seq.);
> c) failure to institute groundwater monitoring procedures in connection with the surface impoundments (40 CFR § 265.90 et seq. and OAC § 3745–65–90 et seq.);
> d) failure to comply with regulations regarding specific operating standards for RCRA-regulated facilities, which included 40 CFR §§ 262.20, 262.23(a)(1), 265.14, 265.16, and 265.171;
> e) failure to disclose the existence of the landfill and the settling basin as well as failing to report that these solid waste units were responsible for releases of hazardous wastes into the environment (40 CFR Part 270; Section 3004(u) of RCRA, 42 U.S.C. § 6924(u); and Section 103(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9603(a).

(plfs' memo at 5).

*Proper Notice Under Article 7*

■ Both sides agree that Article 7 relieves defendants of liability for an obligation or claim under Article 4 if USG did not provide written notice to defendants by April 9, 1989. Defendants argue that because Article 4 provides for indemnity for a loss, liability or expense *incurred* in connection with pre-merger noncompliance, any indemnifiable amounts must themselves have been fully incurred within three years of the merger date. Thus, because both EPA orders were entered after April 9, 1989, defendants claim they are not liable under the agreement. This somewhat tricky argument does not reflect a reasonable reading of Articles 7 and 4. Article 7 says nothing about notice only for already incurred expenses; rather, it addresses only written notice of an Article 4 claim. Nothing under Article 4 prevents notice from being given before the claim is fully and finally adjudicated or settled, or before it is paid for by the indemnitee.

■ As USG points out, other provisions of the indemnity agreement support this reasoning. Article 12, for example, provides that the indemnitor may elect to assume the defense of matters for which it has received notice. Also, it provides that neither party may settle an Article 4 claim without the consent of the other party. We consider USG's questions:

> What, for example, would be the point of a provision which reserves for the indemnitor, as Article 12 does, the right to assume the defense of a claim if the underlying loss or liability giving rise to the claim has already been established? And, what would be the point of a provision which states that neither party may unreasonably withhold its consent to a

settlement of a loss or liability, if the loss has already occurred?

(plfs' reply at 7). The unambiguous answer to these questions is that there would be no point at all. Provisions of a contract must be read consistently with other provisions so that the document makes sense as a whole. *E.S. Preston Assoc., Inc. v. Preston*, 24 Ohio St.3d 7, 492 N.E.2d 441 (1986). Indemnity contracts must be read like other contracts, giving the words their plain and ordinary meaning. *See Allen v. Standard Oil Co.*, 2 Ohio St.3d 122, 443 N.E.2d 497, 499 (1982). The Ohio cases upon which defendants rely do not tell us otherwise. Defendants argue that the plain language supports their position, which it does not. We find that there is no reasonable dispute concerning Article 7—it does not mean what the defendants want it to, nor is it ambiguous.[5]

We do agree with defendants, however, that proper notice must fully and fairly inform the indemnitor of the claims against it. USG agrees with this proposition as well. *See* reply, n. 3. Defendants argue that the notification sent by USG cannot be considered to have fully and fairly informed defendants because valid claims had not yet accrued. This argument fails, however, because it relies on a reading of the indemnity agreement which we have already rejected above. Defendants could have been fully and fairly informed of an Article 4 claim without the claim being finally decided.[6]

■ Defendants argue that notification of indemnification for expenses relating to Order I was not valid under the agreement. The January 11, 1989 (defs' ex. L–14) letter from USG to defendants is unequivocally valid notice under the agree-

---

**5.** We note that, in Illinois at least, extrinsic ambiguity can be present even in the face of facially unambiguous language, "when anyone familiar with the real-world context of the agreement would wonder what it meant with reference to the particular question that has arisen." *Federal Deposit Ins. Corp. v. W.R. Grace & Co.*, 877 F.2d 614, 620 (7th Cir.1989), *cert. denied*, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990). Were this the case, then extrinsic evidence could be used to explain the meaning of the agreement. Whether Ohio law

recognizes this concept does not need to be decided, however, because neither side argues that the agreement is ambiguous and neither side presents any extrinsic evidence to that effect.

**6.** Defendants also point out that Article 6 requires prompt written notice. But, defendants do not argue that notice was not prompt, just that the notice received was premature and thus not valid, as discussed above.

ment. The letter was sent to defendants certified mail, return receipt requested, within the three-year post-merger period. The letter not only spelled out in detail what the EPA complaint was seeking, but a copy of the EPA complaint (Bardo aff., ex. A) was enclosed.[7] The complaint and the letter make clear the claims for which USG was providing notification. USG has demonstrated that the notice as to claims addressed in Order I was proper and timely. Defendants have not rebutted this showing.[8]

However, as to certain claims, USG does extend a somewhat novel concept of full and fair notice. For the alleged instances of noncompliance leading to Order II, USG relies on what may be proper notice of certain claims as proper notice of "outgrowths" of those claims. USG maintains that "EPA Order II identified two bases for the EPA's conclusion that hazardous releases had occurred at the Westlake facility: 1) a July 16, 1987 Preliminary Review (PR)/Visual Site Inspection Report ('VSI Report'); and 2) the previously de-scribed AGI Contamination Assessment report performed by AGI" (memo at 37). Further, USG contends that the AGI study was commissioned as part of the risk assessment performed in connection with the closure of the surface impoundments (reply at 320). Thus, according to USG, Order II was an outgrowth (reply at 12 n. 6) of investigations resulting from Order I and thus, even though Order II was entered after the three-year period, the notice provisions were satisfied. The theory that full and fair notice of one indemnifiable instance will subject defendants to indemnity liability for all subsequent "outgrowths" of the original instances requires more support at this summary judgment stage than USG musters.[9] We note that "[u]nder Ohio law, a prospective indemnitee's failure to provide timely notice to a prospective indemnitor will bar an indemnity action." *United Services Auto Ass'n v. Barger*, 910 F.2d 321, 324 (6th Cir.1990). USG provides no authority for its approach to notice under the indemnity agreement, except for rather conclusory estoppel arguments.[10]

7. Defendants argue that the EPA complaint is not an acceptable form of notice. However, when attached to a certified mail letter, defendants cannot complain. We find this notice to be sufficient for all the claims we address relating to Order I.

8. Defendants also claim that USG is estopped from claiming any pre-merger violations because it denied the allegations in response to the USEPA's complaint leading to Order I. This theory fails because USG based its denials on a lack of sufficient information.

Also, defendants object to the EPA consent orders because defendants did not consent to them, as provided for in the indemnity agreement. In response to the January 11, 1989 letter from USG, however, defendants urged USG "to appropriately answer the USEPA's complaint and to seek an informal settlement of the USEPA claims with respect to this matter" (defs' ex. L–16).

9. USG's other arguments reveal the problem with granting summary judgment. In its reply, USG states:

The Brown defendants cavalierly dismiss the fact that AMC failed to disclose the existence of the abandoned sludge drying pond which was used by AMC until approximately 1966 ... because the U.S. EPA did not directly address this area in either Orders I and II. The EPA, however, has recently learned of this area as a result of the site investigation

work being performed in connection with EPA Order II and has added the sludge drying pond to its list of areas to be further investigated for possible remedial work.

(reply at 23 n. 18). One wonders how long the three-year notice provision could be extended under this reasoning.

10. Plaintiffs claim that:

Even though the second EPA action was commenced subsequent to the three year post-merger notice period, the Brown defendants are estopped from arguing that they did not receive proper notice of this matter for two reasons: 1) EPA Order II evolved from the site investigation work conducted in connection with the closure of the surface impoundments and EPA Order I ... and thus was an outgrowth of the same claim; and 2) the Brown defendants advised USG in a May 11, 1990 letter that they were assuming the defense of the second EPA action, thus affirming that the Brown defendants considered USG's notice regarding the second action to be proper.

Reply at 12 n. 6. Again, the "outgrowth" argument is not as clear as USG claims. We also decline to impose summary judgment based on USG's second estoppel theory. It is not obvious at this stage, and especially given the lack of development by either side, that assuming the defense of a matter is or is not tantamount to a

Also, throughout its briefs USG refers to defendants' actions preventing the EPA from learning about certain matters until after the merger date. Presumably, USG is implicitly arguing that such actions by the defendants should prevent the three-year limitation period from applying or that they should at least toll the period somehow. Unfortunately for USG, this argument is obviously not correct and, in any case, has not been developed by it. For the purposes of this motion, then, it is unavailing to USG.[11]

At this stage we cannot say as a matter of law that USG provided defendants with full and fair notice of the noncompliances related to Order II.[12] Therefore, we deny summary judgment as to these claims.

*Declaratory Relief*

That plaintiffs have provided timely notice of at least some claims does not, however, necessarily entitle them to a declaration of liability. They must also establish,

beyond material factual dispute, that there was, indeed, pre-merger noncompliance as claimed and that plaintiffs have incurred costs as a result of that noncompliance. That does not mean that all the costs must now be determined or even incurred. *Southland Corp. v. Ashland Oil, Inc.*, 696 F.Supp. 994, 1000 (D.N.J.1988). Plaintiffs are not seeking ·summary judgment on damages issues, only a determination that indemnity is appropriate. Defendants deny both pre-merger noncompliance and any resulting costs. We turn, then, to the specific claims.

*Noncompliance with Environmental Laws and Regulations*

Filing of Notification of Hazardous Wastes and the Part A Interim Status·Application.

42 U.S.C. § 6930, 42 U.S.C. § 6925 and 40 CFR § 270.13 govern notification and permit requirements relating to hazardous waste activity.[13] USG claims that defen-

---

waiver of conditions under the indemnity agreement.

**11.** It is far from obvious that the indemnity agreement serves to toll the limitation period. Even if fraud were alleged by USG (which it is not), for purposes of this motion at least, defendants should be able to rely on the three-year limitation period. *See, e.g., Dexter Corp. v. Whittaker Corp.*, 926 F.2d 617, 621 (7th Cir. 1991) ("So far as the contract claim 2 is concerned, however, we are unimpressed by Dexter's main argument for reversal, which is that having induced the contract by fraud Whittaker should not be permitted to rely on the conditions in the contract that limited its liability.... If it fails to prove fraud, fraud drops out of the picture and Dexter is left with a pure contract claim. The contract set a perfectly reasonable condition, found in virtually all insurance and most other indemnity contracts—that the indemnitee not be permitted to settle unilaterally any claim for which it might seek indemnification").

**12.** We note that USG says in note 3 of its reply that "defendants are hard pressed to argue that the Complaint (relating to EPA Order I) or the USEPA's proposed Order II, both of which USG sent the defendants, are 'unspecified' claims." While true, USG does not claim that defendants received proposed Order II prior to the expiration of the three-year post-merger period, only that it was an "outgrowth".

**13.** Section 6930 provides that

any person generating or transporting [hazardous waste] or owning or operating a facility for treatment, storage, or disposal of [hazardous waste] shall file ... a notification stating the location and general description of such activity and the identified or listed hazardous wastes handled by such person.
42 U.S.C. § 6930(a).
40 CFR § 270.13 describes the requirements for the contents of a Part A permit application. Part A of the RCRA application *shall* include:
(h) For existing facilities, (1) a scale drawing of the facility showing the location of all past, present, and future treatment, storage, and disposal areas; and (2) photographs of the facility clearly delineating all existing structures; existing treatment, storage, and disposal areas; and sites of future treatment, storage, and disposal areas.
. . . .
(j) A specification of the hazardous wastes listed or designated under 40 CFR part 261 to be treated, stored, or disposed of at the facility, an estimate of the quantity of such wastes to be treated, stored, or disposed annually, and a general description of the processes to be used for such wastes.
. . . .
(l) A topographic map (or other map if a topographic map is unavailable) extending one mile beyond the property boundaries of the source, depicting the facility and each of its intake and discharge structures; each of its hazardous waste treatment, storage, or disposal facilities....
40 CFR § 270.13.

dants did not comply with § 6930 because they did not disclose that the "landfill, the settling basin, and the original 'sludge-drying pond' were hazardous waste treatment and storage sites which should have been described in AMC's Part A permit application" (plfs' memo at 16).[14] "Under 42 U.S.C. § 6925, anyone 'owning or operating a facility for the treatment, storage, or disposal of hazardous waste' as of November 19, 1980, must obtain operating permits from the EPA." *Environmental Defense Fund, Inc. v. Lamphier*, 714 F.2d 331, 335 (4th Cir.1983); 42 U.S.C. § 6925. There is no dispute that Westlake was such a facility.

Section 6925(e) allows any person owning or operating such a facility who has complied with § 6930(a) and who has applied for a permit pursuant to § 6925 to achieve "interim status."[15] On November 18, 1980, AMC and Donn each submitted the required documents to seek interim status; both filed an EPA Form 1 and Form 3. Form 1 is the notification of hazardous waste (§ 6930) and Form 3 is the permit application (§ 6925). AMC filed an amended Form 1 and 3 on November 3, 1981.

The application did identify the surface impoundments. USG maintains that neither the required diagrams nor the applications identified the settling basin or the sludge-drying pond as treatment, storage or disposal areas, and that the landfill was identified "only in the most cursory fashion" (memo at 15). Also, the application did not contain an explanation of the contents or purpose of the landfill. USG claims defendants violated 40 CFR § 270.13 by not describing the landfill in terms of its size, use or the contents of hazardous wastes contained in it. Also, the landfill

code provided in the key on EPA Form 3 was not used by defendants to describe the landfill (Hauser ex. G).

Defendants deny that the applications were deficient, claiming that these areas were identified on AMC's initial Part A application. Also, defendants claim that the USEPA was aware of the settling basin and labeled it "abandoned impoundment" on the site diagram prepared by FIT.[16] Also, Brown claims that the USEPA and the Ohio Environmental Protection Agency (OEPA) were aware of the landfill and its prior use.

Defendants also argue that the units which were inactive prior to November 19, 1980, did not need to be disclosed because permit requirements did not apply to them. While it may be true that the inactive units did not require permits, defendants mischaracterize USG's argument. *McClellan Ecological Seepage Situation (MESS) v. Cheney*, 763 F.Supp. 431 (E.D.Cal.1989), cited by defendants, addressed the issue of whether a permit was required for an inactive unit prior to November 19, 1980. The issue here is not whether defendants needed a permit for any inactive sites, but rather whether in complying with the requirements for interim status defendants properly disclosed all present and past facilities.

USG asserts that defendants' failure to comply with the notification provisions in § 6930 and 40 CFR § 270 prevented the USEPA from learning about their existence until after the merger. There is no claim that these alleged noncompliances led in any way to the issuance of Order I. As best as we can tell, USG is suggesting that these alleged violations led to EPA Order II. As discussed above, we deny, for now, summary judgment for claims related to

14. Regulations governing the operation of hazardous treatment, storage and disposal facilities under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, became effective on November 19, 1980.

15. Interim status is in effect a temporary permit. The owner or operator of a facility must comply with certain regulations to maintain interim status, during the pendency of an application for a permit.

16. Defendants claim that their exhibits B and D show that the USEPA was aware of the settling basin. USG objects to these exhibits as not authenticated and thus not admissible (reply at 24). Defendants characterize these documents as EPA reports when they are not such on their face. They are reports of a company called Ecology and Environment, Inc. and there is no indication of any affiliation with or reporting to the USEPA. These documents do not demonstrate that the EPA was aware of the settling basin.

Order II. Because USG has not demonstrated a lack of a genuine issue of material fact with respect to whether notice was proper, we decline to decide whether defendants failed to comply with these RCRA provisions as a matter of law. Therefore, we deny summary judgment as to this claim.

Noncompliance with Closure Requirements for Surface Impoundments

When AMC stopped using the surface impoundments in 1982, it sought closure approval under the applicable environmental laws and regulations. Achieving approved closure allows a facility to avoid certain continued monitoring and compliance requirements. USG argues that defendants were not in compliance with the closure regulations prior to the merger. 40 CFR § 265.112 requires that a facility owner have a written closure plan identifying "the steps necessary to completely or partially close the facility during its intended operating life and to completely close the facility at the end of its intended operating life." Also, a facility must be closed in accordance with an *approved* closure plan, and this fact must be certified by an independent registered professional engineer. 40 CFR § 265.115. AMC submitted a written closure plan for the surface impoundments to the Ohio EPA ("OEPA") on November 15, 1982. At the time, the OEPA was the RCRA-authorized state agency for the USEPA.

As of the merger date, defendants had not received approval of their closure plan from either the OEPA or the USEPA. In September 1986, OEPA approved AMC's closure plan.

During 1982, defendants removed sludge from the surface impoundments and had it hauled off-site. In 1987, the USEPA rejected AMC's closure plan because the background material had not been removed to an acceptable level during the sludge

removal. According to 40 CFR §§ 264.112 and 264.113(b), a closure plan must be an approved one. AMC ceased operating the surface impoundments, without final approval, until after the merger. Defendants maintain that they had closed the surface impoundments and had an engineer certify to this. However, the undisputed facts show that the USEPA had not approved closure at the merger date. Defendants were not in compliance with closure requirements before the merger.

USG claims that as a result of AMC's noncompliance with the closure requirements, USG was forced to apply for RCRA closure approval once it learned that the surface impoundments had not been properly "closed." This, in turn, according to USG, led to the issuance of EPA Order I. USG does not make clear in what way defendants' alleged failure to apply with closure requirements led to Order I, except for groundwater monitoring requirements.[17]

Violation of Groundwater Monitoring for Surface Impoundments

Under 40 CFR § 265.90 *et seq.*, an owner or operator of a facility must implement

> a ground-water monitoring program capable of determining the facility's impact on the quality of ground water in the uppermost aquifer underlying the facility....

Moreover,

> [t]his ground-water monitoring program must be carried out during the active life of the facility, and for disposal facilities, during the post-closure care period as well.

40 CFR § 265.90(b). According to the complaint leading to Order I, AMC was not in compliance with RCRA groundwater monitoring requirements for a period of six

17. According to USG, the USEPA also advised USG that it would approve closure of the surface impoundments only on the condition that USG perform an environmental risk assessment of the Westlake site and implement a groundwater monitoring program. Because USG is seeking summary judgment for the costs incurred as

a result of Orders I and II, we are unsure whether they are claiming that the environmental risk assessment is a cost resulting from Order I or II. As such, we cannot grant summary judgment on this claim. The groundwater monitoring requirements are addressed in the next section.

years. According to the USEPA RCRA penalty worksheet (Bardo aff. ex. B),

> Respondent failed to implement a groundwater monitoring program capable of determining impacts of the surface impoundments on the ground and surface water quality.

> There has been no interim status monitoring as cited in the July 29, 1982 and September 9, 1987 inspections.

The worksheet also notes that the noncompliance continued over a six-year period and the EPA assessed a proposed penalty of $44,218. Defendants do not rebut this evidence. USG has demonstrated that groundwater monitoring was not done in compliance with 40 CFR § 265.90 *et seq.* for the six-year period.

Defendants claim 40 CFR § 265(c) allows an owner or operator to seek a waiver of these requirements. While true, it is undisputed that defendants never received a waiver; thus, whether a waiver was a theoretical possibility is irrelevant. Also, as of August 17, 1984, defendants claim that the USEPA had not required the facility to institute groundwater monitoring. The support for this argument comes from the mischaracterization of a letter from the EPA. The letter (defs' ex. J) informs AMC that they appear to be a hazardous waste facility and, if so, that they need to comply with the groundwater monitoring requirements. Because there is no dispute that the surface impoundments were used for the treatment, storage or disposal of hazardous waste, groundwater monitoring was required.

Defendants have failed to rebut USG's evidence that defendants were not in compliance with the RCRA groundwater monitoring requirements, § 265.90 *et seq.*, prior to the merger. As defendants point out, the dates on the EPA worksheet indicate that the violation occurred over a six-year period—some before and some after the merger. It is nevertheless clear that defendants were not in compliance prior to the merger. We therefore grant summary judgment as to those expenses incurred as a result of defendants' pre-merger noncompliance with RCRA groundwater monitoring requirements.[18]

Violations of Operating Standards

Owners and operators of treatment, storage and disposal facilities are subject to specific operating standards. 40 CFR Subparts 262 and 265. USG points to an August 16, 1982 letter from the OEPA to AMC, outlining some problems that AMC would need to address before closure approval. *See* Frescka aff, ex. E.[19]

Defendants claim this letter does not prove noncompliance. They also maintain that the surface impoundments were fenced and signs posted (defs'. ex. C), and that their closure plan provided for the removal of the fence in order to have closure. Also, Brown claims that since 1974, AMC had maintenance and reporting proce-

---

**18.** This will leave until later a determination of the damages attributable to pre-merger activities. We note, however, that in addition to the penalty paid by USG pursuant to Order I, USG also claims to have "incurred costs that total almost $500,000 for implementing a groundwater monitoring program and conducting site investigations and technical work required by the EPA in connection with the environmental studies performed at the AMC site in Westlake, Ohio" (May aff. ¶¶ 9, 10).

**19.** In the letter, the following problems were noted during the July 29, 1982 inspection:
1. Manifest did not indicate the type and number of containers loaded into the transport vehicle as per OAC 3745-52-21(A)(6) and 40 CFR 262.21(a)(6);
2. Quarterly groundwater monitoring data had not been generated as per OAC 3745-55-92 and 40 CFR 265.92;
3. Closure Plan had not been formulated as per OAC 3745-56-03 and 40 CFR 265.112;
4. A written cost estimate for closure had not been formulated as per OAC 3745-56-32 and 40 CFR 265.142;
5. Surface impoundments were being operated with less than two (2) feet of freeboard in violation of OAC 3745-57-03 and 40 CFR 265.222;
6. Earthen dikes had no protective cover as per OAC 3745-5704 and 40 CFR 265.223;
7. Contingency Plan did not specify the type of arrangements your facility has with the local authorities as per OAC 3745-54-52 and 42 CFR 265.52; and,
8. Operating Report pertaining to the surface impoundments was not available for review as per OAC 3745-54-73 and 40 CFR 265.73.

dures in place which addressed surface water discharges, the sanitary sewer system and the wastewater treatment system (Hauser aff. ex. B).

USG has submitted other evidence demonstrating that AMC violated certain RCRA operating requirements prior to the merger. From the complaint of the USEPA (Bardo aff. ex. B), it is clear that these violations provided a basis for EPA Order I and constituted a *portion* of the penalty assessed in connection with that order [20] (reply at 21). However, again, there is the problem that some of the dates given as dates of violation are pre-merger and some are post-merger. USG seems not to address the problem, just claiming that all costs associated with Order I are recoverable. This may ultimately prove to be the case, but on this motion, and without much development from USG, we cannot say as a matter of law that all of the penalties assessed in Order I for noncompliance with operating standards are due to pre-merger noncompliance.[21] We therefore grant summary judgment as to those expenses incurred as a result of defendants' pre-merger noncompliance with operating standards.

**Failure to Comply with RCRA Corrective Action Requirements**

On March 13, 1990, the USEPA instituted another proceeding against AMC, pursuant to Section 3008(h) of RCRA, 42 U.S.C. subsection 6928(h), as a result of the USEPA's concern that a release of hazardous waste had occurred at the Westlake facility.

Section 3004(u) of RCRA, 42 U.S.C. § 6924(u), provides

that facilities shall be required to take corrective action for all releases of hazardous waste or constituents from any solid waste management unit at a treatment, storage, or disposal facility seeking a permit under this subtitle, regardless of the time at which waste was placed in such unit.

USG argues that defendants had knowledge of releases and failed to accurately respond to inquiries from both the OEPA and the USEPA. *See* Plfs' memo at 26–7; Frescka aff. exs. H & K.[22] In responding to the OEPA and USEPA inquiries, defendants informed them that they considered the facility closed because the closure plan had been submitted to the OEPA on November 15, 1982 and because their engineer had certified it closed. *See* Frescka aff. ex. I. As discussed above, the facility was not closed in accordance with EPA regulations.

In any event, we deny summary judgment on this claim. USG claims that there "can be little question that, had AMC disclosed the information it had regarding hazardous releases, that the USEPA would have initiated the same type of corrective action proceeding against pre-merger AMC as it did later against USG" (reply at 32–33). Almost certainly this is true, but the motion as to this claim suffers from the same deficiency as the other claims relating to Order II above—we cannot say as a matter of law that USG complied with the notice provisions as to these claims.

*CERCLA Violations*

USG also claims that defendants were not in compliance with section 103(c) of CERCLA, 42 U.S.C. § 9601 *et seq.*, requiring hazardous waste facilities to file a notification of hazardous waste site with the

---

**20.** The RCRA penalty worksheet indicates violations of 40 CFR §§ 262.20(a), (b) and 262.23(a)(1). Further, "[m]anifests were prepared but specific information required was occasionally missing.... Violations were noted during inspections on May 25, 1984, March 11, 1985 and September 5, 1986." The worksheet lists a proposed penalty of $5,000.

**21.** Presumably, USG would like us to find as a matter of law that had defendants complied fully with the operating standards prior to the merger, then USG would have caused AMC to comply fully after the merger and the post-

merger violation citings would not have happened. This we cannot do on this record and with these briefs.

**22.** USG claims that defendants had knowledge of releases from a 1976 USEPA random sampling inspection. USG also points to a 1981 study by Soil Testing Services and a 1985 study by Lion Technology, Inc., both commissioned by AMC, to demonstrate that defendants should have known of possible releases and should have responded more accurately and completely to the OEPA and the USEPA.

USEPA and notify them of any known, suspected or likely releases of hazardous waste. USG maintains that the May 26, 1981, section 103(c) notification was deficient.[23] It is unclear what damages USG is claiming as a result of the alleged CERCLA violations. Our best reading of the claim is, however, that it is another branch of the claim that omissions and misrepresentations by defendants delayed USEPA from finding out about certain problems until after the merger. As above, we deny summary judgment on this claim, because it relates to damages resulting from Order II.

Ohio Law Violations

USG seeks a determination of liability as to violations of Ohio law as well, which, USG maintains, is parallel to USEPA regulations. USG argues that there is no requirement under the indemnity agreement that a governmental entity make a finding of a violation of an environmental law before defendants' duty to indemnify USG arises. According to USG, it "is sufficient that USG has proven violations of the Ohio statutes and regulations, and eventual damages arising from that activity which has resulted from EPA Orders I and II" (reply at 34).

We decline to determine whether there were violations of Ohio environmental laws. While it is true that USG can theoretically get indemnification for pre-merger Ohio environmental law violations, we cannot say that because there may have been state law violations that somehow these contributed to the cost incurred in Orders I and II. And USG does not develop this area enough. Moreover, if as USG maintains, Ohio law parallels USEPA law, then as to recovery under the indemnity agreement, a finding of noncompliance with Ohio law does not add anything to the equation that federal law does not already provide.

Therefore, we deny summary judgment with respect to Ohio law violations.

CONCLUSION

We grant summary judgment as to those expenses incurred as a result of defendants' pre-merger noncompliance with RCRA groundwater monitoring requirements and as to those expenses incurred as a result of defendants' pre-merger noncompliance with operating standards. We deny, for now, summary judgment for claims related to Order II. We deny summary judgment with respect to CERCLA violations and Ohio law violations.

---

**23.** USG claims the notification referenced only the landfill, not the original sludge drying pond or the settling basin, as required. Defendants deny this because the 1981 CERCLA notification referenced the entire site as a landfill, and thus was in compliance (Frescka, ex. A). USG also notes that defendants marked "none" on the questionnaire when asked about known, likely or suspected releases of hazardous waste. According to USG, defendants should have known this was wrong given the USEPA random sampling inspection, the 1981 study by Soil Testing Services and the 1985 study by Lion Technology, Inc. The issues involved in these disagreements seem to involve issues of fact.