**INTERFAITH COMMUNITY ORGANIZATION, et al.,**
Plaintiffs,

v.

**ALLIEDSIGNAL, INC.,**
et al., Defendants.

Civil Action No. 95–2097 (AJL).

United States District Court,
D. New Jersey.

April 25, 1996.

Bruce J. Terris, Carolyn Smith Pravlik, Eric A. Bilsky, Terris, Pravlik & Wagner, Washington, D.C., Edward Lloyd, Newark, NJ, for Plaintiffs.

Jeffrey B. Gracer, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for Defendant AlliedSignal, Inc.

Robert G. Rose, Pitney, Hardin, Kipp & Szuch, Morristown, NJ, for Defendants W.R. Grace & Co., W.R. Grace, Ltd. and ECARG, Inc.

Timothy S. Haley, Montclair, NJ, for Defendants Roned Realty of Jersey City, Inc. and Roned Realty of Union City, Inc.

## OPINION

LECHNER, District Judge.

This is an action brought by plaintiffs Interfaith Community Organization ("Interfaith"), Lawrence Baker ("Baker"), Martha Webb Herring ("Herring"), Margaret Webb ("Webb"), Reverend Winston Clarke ("Clarke") and Margarita Navas ("Navas") (collectively the "Plaintiffs") against defendants AlliedSignal, Inc. ("AlliedSignal"), Roned Realty of Jersey City, Inc. and Roned Realty of Union City, Inc. (together "Roned") and W.R. Grace & Co. ("Grace–U.S.A."), ECARG, Inc. ("ECARG") and W.R. Grace, Ltd. ("Grace–England") (together "Grace Companies") (collectively the "Defendants") seeking declaratory and injunctive relief, civil penalties and an award of costs for the cleanup of environmental contamination at the Roosevelt Drive–In site in Jersey City, New Jersey (the "Site"). An amended complaint (the "Amended Complaint") was filed on 2 August 1995. Jurisdiction is alleged pursuant to 42 U.S.C. § 6972(a) and 33 U.S.C. § 1365(a).

Currently before the court is a motion to dismiss filed by AlliedSignal (the "AlliedSignal Motion to Dismiss") and a second motion to dismiss filed by Grace Companies (the "Grace Companies Motion to Dismiss") (collectively the "Dismissal Motions").[1] Roned joined the AlliedSignal Motion to Dismiss. For the reasons set forth below, the Dismissal Motions are granted as to Counts II and III and denied as to Count I.

*Facts*

A. *The Parties*

Interfaith is a not-for-profit corporation incorporated under the laws of the State of New Jersey. Amended Complaint, ¶ 19. Interfaith fosters participation by church leaders in the public and political life of their communities. *Id.* Its membership consists of churches from nine religious denominations including the Monumental Baptist Church. *Id.*, ¶¶ 19, 25. Interfaith alleges its interest in chromium contamination in Hudson County arose from its inability to locate

---

1. In support of the AlliedSignal Motion to Dismiss, AlliedSignal submitted: Notice of Motion to Dismiss Plaintiffs' Complaint; Brief of Defendant AlliedSignal Inc. In Support of Motion to Dismiss Complaint Pursuant to Rules 12(b)(1) and 12(b)(6) ("AlliedSignal Brief"); Certification of Jeffrey B. Gracer, Esq. In Support of Allied-Signal's Motion to Dismiss ("Gracer Cert.") attaching Exhibits A through B; Supplemental Letter Brief ("AlliedSignal Supp. Brief"); Reply Letter Brief ("AlliedSignal Reply Brief"); and 1 March 1996 Response Letter. Roned joined the AlliedSignal Motion to Dismiss by letter dated 8 July 1995.

In support of the Grace Companies Motion to Dismiss, Grace Companies submitted: Notice of Motion to Dismiss the Complaint Pursuant to Rule 12(b)(6) ("Grace Companies Notice of Motion"); Letter Memorandum In Support of Motion to Dismiss ("Grace Companies Brief"); Supplemental Letter Brief ("Grace Companies Supp. Brief"); Letter of Additional Authority to Supplemental Letter Brief; and Reply Letter Brief ("Grace Companies Reply Brief"). Grace Companies also rely on the briefing completed for the AlliedSignal Motion to Dismiss. *See* Grace Companies Notice of Motion.

In opposition to both motions, Plaintiffs submitted: Plaintiffs' Brief In Opposition to Defendants' Motions to Dismiss ("Plaintiffs Brief"); Response Letter dated 26 January 1996 ("Plaintiffs Response Let."); and Reply Letter dated 12 March 1996 ("Plaintiffs Reply Let.").

non-chromium contaminated land in Hudson County on which it could construct 600 units of single-family housing and the discovery that members of Interfaith were affected by chromium. *Id.*, ¶¶ 20–21.

Baker is a member of the Monumental Baptist Church and lives within two miles of the Site. *Id.*, ¶ 26. From March 1973 through May 1990, Baker worked approximately one-half mile from the Site. *Id.* From the summer of 1991 through the middle of 1993, Baker worked as a security guard on property adjoining the Site. *Id.* His current employment requires him to go to the Jersey City Authority gas pumps located on property adjacent to the Site once or twice a month. *Id.*

Herring and Webb are members of the Monumental Baptist Church and live within one-quarter mile from the Site. *Id.*, ¶¶ 28, 30. For a period of time, the length of which is not ascertainable from the Amended Complaint, Herring and Webb worked at the Valley Fair store located on the Site. *Id.* From 1970 to 1980, Herring and Webb shopped at the Valley Fair store regularly. *Id.* Herring and Webb allege their current proximity to the Site includes shopping for groceries two or three times a week at the Pathmark store located approximately one block from the Site (the "Parkmark Store"). *Id.*

Clarke is an individual member of Interfaith and lives less than one-quarter mile from the Site. *Id.*, ¶ 32. Clarke alleges his current proximity to the Site includes shopping for groceries at the Pathmark Store daily. *Id.* In August 1991, Navas moved into a condominium located less than one-quarter mile from the Site. *Id.*, ¶ 34. Eight months later, in April 1992, Navas was diagnosed with sarcoidosis which she is concerned may be caused by the chromium waste near her home. *Id.* Navas also alleges her current proximity to the Site includes shopping at the Parkmark Store four or five times a week. *Id.*, ¶ 35.

AlliedSignal is a corporation incorporated under the laws of the State of Delaware. *Id.*, ¶ 38. Mutual Chemical Company of America

("Mutual") owned and operated a chromate chemical production facility from approximately 1905 to 1954 in Jersey City, Hudson County, New Jersey. *Id.*; Gracer Cert., Exh. A at 1.[2] On or about 12 August 1954, Allied Chemical and Dye Corporation ("Allied/Dye") acquired all the stock of Mutual. Amended Complaint, ¶ 38. In December 1954, Mutual sold the Site to Amy Joy Realty Corporation for the construction of an outdoor theater. *Id.* On or about 23 February 1955, Allied/Dye filed an application for a Certificate of Dissolution of Mutual (the "Certificate"). *Id.* The New Jersey Secretary of State issued the Certificate five days later. *Id.*

On or about 1 March 1955, Allied/Dye executed a merger agreement with the Dissolution Trustees for Mutual; Allied/Dye agreed to exonerate, indemnify and save harmless Mutual against all liability. *Id.* After the merger, Mutual became the Mutual Chemical Division of Allied/Dye. *Id.* Approximately three years later, the merged company changed its name to Allied Chemical Corporation. *Id.* On or about 27 April 1981, Allied Chemical Corporation changed its name to Allied Corporation and in 1985, the company combined with Signal Companies, Inc. to form AlliedSignal. *Id.*

Grace–U.S.A. is a corporation incorporated under the laws of the State of Connecticut. *Id.*, ¶ 41. Grace–England is a direct subsidiary of Grace–U.S.A. with a registered office in London, England. *Id.* ECARG is a corporation incorporated under the laws of the State of New Jersey. *Id.* Roned Realty of Jersey City and Roned Realty of Union City are corporations incorporated under the laws of the State of New Jersey. *Id.*, ¶ 45.

Grace–U.S.A. and Grace–England were the sole stockholders of Grace Retail Corporation ("Grace Retail"), which acquired two parcels of land constituting the largest portion of the Site. *Id.*, ¶ 42. In November 1986, the Channel Acquisition Company ("Channel") acquired Grace Retail and pursuant to the letter agreement, Grace Retail was to distribute some of its assets, including

**2.** A court may consider undisputedly authentic documents a defendant attaches to a motion to dismiss if the plaintiff's claims are based on those documents. *See infra* Discussion, Part A.

its portion of the Site, to Grace–U.S.A. and Grace–England. *Id.*, ¶ 43. This transfer, however, never occurred. *Id.* Nevertheless, Grace–U.S.A. and Grace–England were unaware the transfer did not occur and acted as owners of the parcels until 14 October 1994. *Id.* On 14 October 1994, then-owner Channel conveyed the parcels to ECARG.

The records of the Jersey City Assessor's Office list a Roned Realty Corp. as the owner of another parcel of the Site. *Id.*, ¶ 45. It is unclear if the owner is either Roned Realty of Jersey City or Roned Realty of Union City. *Id.*

### B. *Chromium Contamination at the Site*

Mutual owned and operated a chromate chemical production facility (the "Facility") on West Side Avenue and Route 440 in Jersey City, Hudson County, New Jersey. Gracer Cert., Exh. B, ¶ 3. Operations at the Facility ended in 1954. *Id.* The Facility extracted chromium from chromium ores to produce chromate chemicals. Amended Complaint, ¶ 46. The process generated chromium-bearing waste which Mutual transported through a pipeline onto the Site. *Id.* In addition to the chromium-bearing waste, Mutual dumped unknown amounts of other refuse at the Site. *Id.* By 5 December 1953, waste at the Site was in a pile covering an area of approximately ten acres and measuring from ten to thirty feet high. *Id.* Between 1952 and 1954, Mutual sold chromium-bearing waste from the Site to be used as fill. *Id.*

Groundwater flow at the Site moves from east to west, from Route 440 toward the Hackensack River. *Id.*, ¶ 48. Plaintiffs allege pollutants leach into the groundwater and are carried from the Site and discharged into the Hackensack River. *Id.* Drainage ditches lined with a layer of polyvinyl chloride, a layer of another geotextile and gravel are located at the northern and southern edges of the Site leading to the Hackensack River. *Id.*, ¶ 47. Plaintiffs further allege that at high tide water from the Hackensack River enters the drainage ditches and chromium is washed from the drainage ditches into the Hackensack River. *Id.*

### C. *NJDEP Administrative Consent Order*

In 1983, AlliedSignal informed the New Jersey Department of Environmental Protection ("NJDEP") that the Site was contaminated with chromium-bearing waste. *Id.*, ¶ 61. In 1983, sampling and analysis were conducted at the Site by a contractor hired by the Grace Companies. *Id.*, ¶ 67. The Grace Companies have not taken action to cleanup the portion of the Site they own. *Id.* In 1987 and 1988, Roned completed an Interim Remedial Action on its portion of the Site, placing a one-foot soil cover and asphalt cover over parts of the Site. *Id.*, ¶ 69. Roned has taken no further action to cleanup the portion of the Site it owns. *Id.*

On 2 December 1988, NJDEP issued a Directive entitled *In re Hudson County Chromate Chemical Production Waste Sites and Allied–Signal [sic] Inc.; PPG Industries Inc.; Occidental Chemical Corp.; and Maxus Energy Corp., Respondents. Id.,* Exh. A at 1. The Directive was issued to notify the captioned respondents NJDEP determined it was necessary to remove, or arrange for the removal of, certain hazardous substances, namely chromium-bearing waste, from several locations including the Site. *Id.*

AlliedSignal contends it performed an Interim Remedial Measure ("IRM") at the Site pursuant to the Directive. AlliedSignal Brief at 3. The Directive ordered AlliedSignal to undertake IRMs at several locations where Mutual's waste had allegedly been deposited, including the Site. The Directive provided that AlliedSignal "shall" submit an interim remedial work plan, and upon receipt of NJDEP approval, "immediately" commence implementation of IRMs designed to prevent the discharge of chromium-bearing waste. The Directive also required AlliedSignal to conduct periodic monitoring and maintenance of the IRMs.

Pursuant to the Directive, AlliedSignal conducted an IRM at the Site by regrading a portion of the Site and placing a polyvinyl chloride cover over the regraded portion. Amended Complaint, ¶ 61. Thereafter, as part of the IRM and under NJDEP supervision, AlliedSignal installed a new bulkhead

over the existing bulkhead along the Hackensack River. *Id.,* ¶ 61; AlliedSignal Brief at 4. When the initial polyvinyl chloride cover was damaged by high winds, AlliedSignal repaired and reinforced the cover. Amended Complaint, ¶ 62.

On 17 June 1993, AlliedSignal entered into an Administrative Consent Order ("ACO") with NJDEP. *Id.,* ¶ 64. The ACO requires AlliedSignal to conduct a remedial investigation and feasibility study ("RI/FS") for eighteen locations, including the Site.[3] *Id.* The ACO establishes a process for conducting RI/FS at the Site and selecting an appropriate remedial action. *Id.,* ¶ 63. AlliedSignal has committed $10 million to conduct RI/FSs for the eighteen locations included in the ACO, including the Site. *Id.* The ACO requires AlliedSignal spend $50 million plus the difference between $10 million and any lower amount spent on the RI/FS for remediation of the Site. *Id.,* ¶ 64. If the remediation cost for all eighteen locations exceeds this set amount, AlliedSignal has agreed to implement remediation in full unless it disagrees with the appropriateness of the remedies selected. *Id.;* Gracer Cert., Exh. B, ¶ 35. Plaintiffs allege AlliedSignal has not committed itself specifically to remediate the Site. *Id.*

### D. *Procedural History*

Plaintiffs filed a complaint (the "Complaint") on 3 May 1995. On 10 July 1995, Defendants filed the Dismissal Motions with supporting briefs. At a status conference held on 27 July 1995 (the "27 July 1995 Status Conference"), Plaintiffs were granted leave to amend the Complaint. *See* 27 July 1995 Minutes of Proceedings ("27 July 1995 Minutes"). Plaintiffs were told to make all changes to the Complaint they considered

appropriate in light of the arguments set forth in the Dismissal Motions. Plaintiffs acknowledge they amended the Complaint "in response to [D]efendants' motions." Plaintiffs Brief at 1.

At the 27 July 1995 Status Conference, Defendants were told to resubmit the Dismissal Motions pursuant to Local Rule 12N. *See* 27 July 1995 Minutes. Defendants were permitted to refile the same moving papers and, if so inclined after reviewing the Amended Complaint, submit supplemental briefs.

The Amended Complaint was filed on 2 August 1995. Plaintiffs were in possession of the Dismissal Motions for more than three weeks prior to the 2 August 1995 due date. AlliedSignal contends Plaintiffs' changes were limited to the addition of factual allegations in paragraphs 47 and 48 of the Amended Complaint. AlliedSignal Supp. Brief at 1. Plaintiffs have not made any requests to amend the Amended Complaint.

At oral argument on the Dismissal Motions, it was suggested, and the parties agreed, to invite NJDEP to intervene as a party or appear as an *amicus curiae,* if it chose to do so. By Order, filed 7 December 1995 (the "Order"), the Dismissal Motions were denied without prejudice to allow NJDEP to participate. The Order also authorized refiling of the Dismissal Motions based upon the papers previously filed once NJDEP decided whether to participate in this action.

On 11 January 1996, NJDEP informed this court it had determined it would not intervene as a party or submit a brief on the Dismissal Motions (the "NJDEP Submission").[4] The Dismissal Motions were refiled and a status conference was held scheduling

---

**3.** NJDEP and AlliedSignal agreed the ACO was not an admission of fault or liability. Gracer Cert., Exh. B, ¶ 16 (entrance "into this [ACO is] to avoid the expense and inconvenience of litigation and without trial or adjudication of any issue of law, fact, fault or liability, or any admission of the accuracy of any of the FINDINGS contained herein").

**4.** While not intervening into the action, the NJDEP Submission stated, in pertinent part:

The legal issues before the court have already been fully briefed by the parties. As a factual matter, it is correct that the Roosevelt Drive–In property, [the Site], is one of a number of separate sites which are the subject of an [ACO] entered into between NJDEP and Allied Signal, Inc. [sic]. Allied Signal is in compliance with that [ACO]. The remedial investigation required by that Order has not been completed. The NJDEP expects that the [ACO] will result in remediation of [the Site].
NJDEP Submission at 1.

dates by which Plaintiffs and Defendants had to respond to the NJDEP Submission.

In Count I of the Amended Complaint, Plaintiffs allege Defendants violated section 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), because the chromium-bearing waste present at the Site presents an imminent and substantial endangerment to health or the environment. *Id.*, ¶¶ 71–74. In Count II of the Amended Complaint, Plaintiffs allege Defendants violated sections 3005 and 7002(a)(1)(A) of RCRA, 42 U.S.C. §§ 6925 and 6972(a)(1)(A), by storing and disposing of hazardous waste at the Site without a permit as required by RCRA. *Id.*, ¶¶ 75–79. In Count III of the Amended Complaint, Plaintiffs allege Defendants violated sections 301(a) and 402 of the Federal Water Pollution Control Act ("WPCA"), 33 U.S.C. §§ 1311(a) and 1342, by discharging hazardous waste into the Hackensack River without a permit. *Id.*, ¶¶ 80–84.

Defendants move to dismiss the Amended Complaint asserting: (1) Count I is precluded under sections 6972(b)(2)(B)(iv) and 6972(b)(2)(C)(iii) of RCRA; (2) Count I is not ripe for adjudication; (3) Counts II and III are impermissible collateral attacks on remedial activity; (4) no RCRA permit is required as alleged in Count II; and (5) no WPCA permit is required as alleged in Count III.

*Discussion*

### A. Consideration Of Facts Derived From Documents Other Than The Amended Complaint

■ For purposes of the Dismissal Motions, Defendants accept as true the factual allegations in the Amended Complaint. *See* AlliedSignal Brief at 4. Additional facts are derived from the Directive and the ACO. A court may consider undisputedly authentic documents a defendant attaches to a motion to dismiss if the plaintiff's claims are based on those documents. *Dykes v. Southeastern Penn. Transp. Auth.*, 68 F.3d 1564, 1567 n. 3 (3d Cir.1995); *In re Donald J. Trump Casino Sec. Litig.–Taj Mahal Litig.*, 7 F.3d 357, 368 n. 9 (3d Cir.1993), *cert. denied,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *Pension Benefit Guar. Corp. v. White Con-*

*sol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994).

Documents a court may consider include those specifically referred to in the complaint or other public records on which the claim is based, such as letter decisions of public agencies. *Pension Benefit,* 998 F.2d at 1197. If a court could not consider such documents, "a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied." *Dykes,* 68 F.3d at 1567 n. 3. Because Plaintiffs' claims are based, in part, on the Directive and the ACO, they may be considered without converting the Dismissal Motions into summary judgment motions.

■ A court can refer to documents on which a complaint is based without converting a Rule 12(b)(6) motion into one for summary judgment because "reference to the full texts is necessary to place the defendants' [actions] cited by plaintiffs in their ... [c]omplaint into the proper context." *Renz v. Shreiber,* 832 F.Supp. 766, 771 (D.N.J.1993). This is consistent with Rule 12(b)(6) because " '[w]hen a complaint relies on a document ... the plaintiff obviously is on notice of the contents of the document and the need for a chance to refute evidence is greatly diminished.' " *Dykes,* 68 F.3d at 1567 n. 3 (quoting *Pension Benefit,* 998 F.2d at 1196–97).

In the Amended Complaint, Plaintiffs rely on the IRMs AlliedSignal performed pursuant to the Directive. *See* Amended Complaint, ¶¶ 61–62, 76, 81. Consideration of the Directive is appropriate because it puts AlliedSignal's conduct into a proper context. *See, e.g., Renz,* 832 F.Supp. at 771. Plaintiffs also refer to and quote excerpted portions of the ACO in the Amended Complaint. Amended Complaint, ¶ 63. Consideration of the ACO is therefore also appropriate. *See, e.g., Renz,* 832 F.Supp. at 771 (consideration of defendants' exhibits, all of which were excerpted, summarized or alluded to in the complaint, is appropriate in a Rule 12(b)(6) motion).

### B. Standard For Dismissal Under Rule 12(b)(6)

■ When considering a motion to dismiss, all allegations in the complaint must be

accepted as true and all reasonable factual inferences drawn in the plaintiff's favor. *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989); *Gomez v. Toledo,* 446 U.S. 635, 636 n. 3, 100 S.Ct. 1920, 1922 n. 3, 64 L.Ed.2d 572 (1980); *Piecknick v. Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir.1994); *ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir.1994); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991); *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 919 F.Supp. 756, 758–59 (D.N.J.1996); *Sim Kar Lighting Fixture Co. v. Genlyte, Inc.,* 906 F.Supp. 967, 970 (D.N.J.1995); *Bermingham v. Sony Corp. of Am., Inc.,* 820 F.Supp. 834, 846 (D.N.J.1992), *aff'd,* 37 F.3d 1485 (3d Cir. 1994). Nevertheless, legal conclusions made in the guise of factual allegations are given no presumption of truthfulness. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 2944–45, 92 L.Ed.2d 209 (1986); *Bermingham,* 820 F.Supp. at 846; *see also Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Western Mining Council v. Watt,* 643 F.2d 618, 626 (9th Cir.), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981).

■ A Federal court reviewing the sufficiency of a complaint has a limited role. A court may dismiss a complaint for failure to state a claim where it appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Piecknick,* 36 F.3d at 1255; *ALA,* 29 F.3d at 859; *Jordan,* 20 F.3d at 1261; *College Sav. Bank,* 919 F.Supp. at 758–59. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Estate of Bailey v. County of York,* 768 F.2d 503, 506 (3d Cir.1985); *College Sav. Bank,* 919 F.Supp. at 758–59; *Bermingham,* 820 F.Supp. at 846. Rule 12(b)(6) does not, however, sanction "dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1832; *Zucker v. Quasha,* 891 F.Supp. 1010, 1013 (D.N.J.1995).

### C. *Count I of the Amended Complaint*

In Count I of the Amended Complaint, Plaintiffs allege a right to bring a citizen suit pursuant to section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), because the chromium-bearing waste present at the Site presents an imminent and substantial endangerment to health or the environment. Amended Complaint, ¶¶ 71–74. Defendants assert Count I should be dismissed because any danger presented by the Site is the subject of on-going remediation efforts and a citizen suit is therefore precluded under RCRA. AlliedSignal Brief at 7–8; Grace Companies Brief at 2–3. Defendants alternatively argue the imminent and substantial endangerment claim in Count I is not ripe for adjudication. AlliedSignal Brief at 9–11. As discussed below, Defendants' arguments as to Count I fail. The AlliedSignal Motion to Dismiss and Grace Companies Motion to Dismiss are denied as to Count I of the Amended Complaint.

#### 1. *Count I Is Not Precluded By On-Going Remediation*

■ The express terms of RCRA make clear, *inter alia,* that only an action by the Administrator of the United States Environmental Protection Agency (the "EPA") or a diligently prosecuted remediation effort by a State under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, *et seq.,* may preclude a citizen suit.

#### a. *Preclusion Under Section 7002(b)(2)(B)(iv) of RCRA*

■ Defendants argue Count I of the Amended Complaint is precluded under section 7002(b)(2)(B)(iv) of RCRA, 42 U.S.C. § 6972(b)(2)(B)(iv), because the provision provides an explicit preclusion against challenges by private parties to remedial activities undertaken according to court or admin-

istrative orders. AlliedSignal Brief at 6–7; Grace Companies Brief at 2–3. Section 7002(b)(2)(B)(iv) of RCRA states, in pertinent part:

> No action may be commenced ... if the Administrator, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment ... has obtained a court order (including a consent decree) or issued an administrative order under section 106 of [CERCLA] or section 6973 of this title pursuant to which a responsible party is diligently conducting a removal action, [RI/FS], or proceeding with a remedial action.

42 U.S.C. § 6972(b)(2)(B)(iv). The plain language of section 7002(b)(2)(B)(iv) is satisfied only when the court order, administrative order or consent decree is issued under section 106 of CERCLA or section 7003 of RCRA.[5] In the Amended Complaint, Plaintiffs allege the EPA has not issued an administrative order, pursued litigation or executed a consent decree under section 106 of CERCLA or section 7003 of RCRA. Amended Complaint, ¶ 13. Defendants' contention that State administrative efforts are similar enough to Federal administrative efforts to satisfy section 7002(b)(2)(B)(iv) is not supported by the plain language of section 7002(b)(2)(B)(iv) or case law.

Unlike RCRA, CERCLA does not provide for the delegation of Federal regulatory powers to the States. *See* 42 U.S.C. §§ 9604, 9606; *Acme Printing Ink Co. v. Menard, Inc.,* 870 F.Supp. 1465, 1475 (E.D.Wis.1994), *reconsidered in non-relevant part,* 891 F.Supp. 1289 (E.D.Wis.1995). Section 106 of CERCLA specifies actions taken pursuant to the section are taken by the President of the United States (as delegated to the EPA) "[i]n addition to any other action taken by a State or local government." 42 U.S.C. § 9606(a). Nothing in the language of section 106 of CERCLA or in interpretative case law indicates State administrative actions should be deemed equivalent to section 106 of CERCLA. *Compare* 42 U.S.C. § 9606 to 42 U.S.C. § 9604 which authorizes cooperative Federal/state cleanup activities.

This statutory language is interpreted literally; even a consent order issued under a different section of CERCLA does not trigger RCRA preclusion of private suits. For example, in *Acme Printing Ink Co. v. Menard, Inc.,* the court held section 7002(b)(2)(B)(iv) bars a citizen suit only when the EPA has obtained a court order or issued an administrative or consent order under section 7003 of RCRA or section 106 of CERCLA. 812 F.Supp. 1498, 1507 (E.D.Wis. 1992). A consent order issued under section 122 of CERCLA, a section of CERCLA not enumerated in the RCRA preclusion provision, does not bar a citizen suit. *Id.* at 1507–08.

In addition, section 7003 of RCRA concerns actions by the EPA and states "the Administrator" may bring suit on behalf of the United States "to address an imminent and substantial endangerment." 42 U.S.C. § 6973(a). RCRA defines the term "Administrator" as "the Administrator of the [EPA]." 42 U.S.C. § 6903(1). In another subchapter of RCRA, a State government is authorized to take over administration of the hazardous waste program from the Federal government. *See* 42 U.S.C. §§ 6926(b) and (d) (a state is authorized to "issue and enforce permits for the storage, treatment, or disposal of hazardous waste"). "Any action

---

**5.** It is a cardinal rule of statutory construction that when "the terms of a statute are unambiguous, judicial inquiry is complete." *Adams Fruit Co. v. Ramsford Barrett,* 494 U.S. 638, 642, 110 S.Ct. 1384, 1386–87, 108 L.Ed.2d 585 (1990) (citing *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701–02, 66 L.Ed.2d 633 (1981)). In such a case, where the plain meaning of a statute is evident from the face of the statute, "'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)); *see also In re Unisys Sav. Plan Litig.,* 74 F.3d 420, 444 (3d Cir.1996) ("'where [Congress'] will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive'") (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 3249–50, 73 L.Ed.2d 973 (1982)); *Resolution Trust Corp. v. W.W. Dev. & Management, Inc.,* 73 F.3d 1298, 1306 (3d Cir.1996); *In re TMI,* 67 F.3d 1119, 1123 (3d Cir.1995); *United States v. Kramer,* 913 F.Supp. 848, 862 (D.N.J.1995).

taken by a State under a hazardous waste program *authorized under this section* shall have the same force and effect as an action taken by the Administrator *under this subchapter.*" 42 U.S.C. § 6926(d) (emphases added). Section 3006 of RCRA is contained in subchapter 3, Hazardous Waste Management, of RCRA and section 7003 of RCRA is contained in subchapter 7, Miscellaneous Provisions, of RCRA. The "same force and effect" provision in section 3006 of RCRA does not apply to section 7003 of RCRA because sections 3006 and 7003 are not in the same subchapter.

   b. *Preclusion       Under       Section 7002(b)(2)(C)(iii) of RCRA*

Defendants further assert Count I of the Amended Compliant is precluded by section 7002(b)(2)(C)(iii) of RCRA, 42 U.S.C. § 6972(b)(2)(C)(iii). AlliedSignal Brief at 8; Grace Companies Brief at 2–3. Section 7002(b)(2)(C)(iii) of RCRA provides, in pertinent part:

> No action may be commenced ... if the State, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment ... has incurred costs to initiate a [RI/FS] under section 104 of [CERCLA] and is diligently proceeding with a remedial action under [CERCLA].

42 U.S.C. § 6972(b)(2)(C)(iii). Defendants contend that because the ACO states AlliedSignal has reimbursed the State for investigative costs and it requires AlliedSignal to prepare an RI/FS, the State has incurred costs to initiate an RI/FS under section 104 of CERCLA. AlliedSignal Brief at 8. Defendants once again gloss over the plain language of the statute, which specifically precludes citizen suits when the State is pursuing a section 104 CERCLA action.

Defendants acknowledge the only enforcement action taken by NJDEP is under State statutes and not CERCLA. AlliedSignal Brief at 7.

■ For a State action to be conducted pursuant to section 104 of CERCLA, there must be an agreement between the State and the Federal government pertaining specifically to the action and to the site.[6] 42 U.S.C. § 9604(d)(1)(A). No such cooperative agreement is alleged in this case. A RI/FS conducted solely pursuant to State law does not bar a citizen suit brought pursuant to section 7002(b)(2)(C)(iii) of RCRA. *Orange Env't, Inc. v. County of Orange,* 860 F.Supp. 1003, 1028 (S.D.N.Y.1994); *see also Murray v. Bath Iron Works Corp.,* 867 F.Supp. 33, 41 (D.Me.1994); *Paper Recycling, Inc. v. Amoco Oil Co.,* 856 F.Supp. 671, 676 (N.D.Ga.1993); *Utah State Dep't of Health v. Ng,* 649 F.Supp. 1102, 1109 (D.Utah 1986).

For example, in *Orange Env't,* the New York Department of Environmental Conservation ("NYDEC") entered into a consent order with a county pursuant to which the county undertook a RI/FS of the county landfill. 860 F.Supp. at 1013. A citizen suit was brought to enforce a cleanup of the county landfill and the county sought to bar the suit on the ground, *inter alia,* NYDEC had incurred costs to initiate a RI/FS under section 104 of CERCLA. *Id.* at 1025. The court held the State administrative action was not an action under section 104 of CERCLA because the State had not entered into a cooperative agreement with the EPA. *Id.* at 1028.

   2. *Ripeness*

■ Defendants alternatively argue Count I of the Amended Complaint fails to present a concrete, present dispute for adjudication. AlliedSignal Brief at 9–11. Feder-

---

**6.** Section 104 of CERCLA states, in pertinent part:

 A State or political subdivision thereof or Indian tribe may apply to the President to carry out actions authorized in this section. If the President determines that the State or political subdivision or Indian tribe has the capability to carry out any or all of such actions in accordance with the criteria and priorities established pursuant to section 9605(a)(8) of this

title and to carry out related enforcement actions, the President may enter into a contract or cooperative agreement with the State or political subdivision or Indian tribe to carry out such actions. The President shall make a determination regarding such an application within 90 days after the President receives the application.

42 U.S.C. § 9604(d)(1)(A).

al courts can only resolve actual "cases" and "controversies." U.S. Const. art. III, § 2. The existence of a case or controversy is a prerequisite to all Federal actions, including those for declaratory and injunctive relief. *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671–72, 70 S.Ct. 876, 878–79, 94 L.Ed. 1194 (1950); *Travelers Ins. Co. v. Obusek,* 72 F.3d 1148, 1153 (3d Cir.1995); *Armstrong World Indus. Inc. v. Adams,* 961 F.2d 405, 411 (3d Cir.1992). As well, the case or controversy must have existed at the time the case was filed. *Luis v. Dennis,* 751 F.2d 604, 608 (3d Cir.1984).

It is long established that a case or controversy exists if there exists a threatened or potential injury that is "real or immediate." *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). The case or controversy requirement exists to ensure there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Travelers Ins.,* 72 F.3d at 1154 (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)).

■ The case or controversy requirement, however, does not require a party to site idly by until injury is inflicted upon it. *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720–21, 75 L.Ed.2d 752 (1983) ("[o]ne does not have to await the consummation of threatened injury to obtain preventative relief"); *Travelers Ins.,* 72 F.3d at 1154 ("the party seeking declaratory relief need not wait until the harm has actually occurred to bring the action"). A case or controversy exists when plaintiffs demonstrate they have "sustained or [are] immediately in danger of sustaining some direct injury." *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983).

■ In the Amended Complaint, Plaintiffs allege "[t]he hazardous waste, including chromium-bearing waste, at the [Site], may present an imminent and substantial endangerment to health or the environment." [7] Amended Complaint, ¶ 73. Chromium-bearing waste has been and continues to be present at the Site. *Id.,* ¶¶ 46, 61, 73. The Amended Complaint is based on actual and long-standing contamination which may be presenting a harm to human life and the environment. Section 7002 of RCRA authorizes citizen suits, like this one, to address alleged endangerments. *See* 42 U.S.C. § 6972. RCRA only precludes a citizen suit when certain administrative actions are being pursued. *Id.* As discussed above, Defendants failed to demonstrate the ACO precludes this action.

Grace Companies and Roned are not parties to the ACO and are not bound by its terms. *See* Gracer Cert., Exh. B. Plaintiffs allege the ACO does not specifically bind AlliedSignal to fully remediate the Site. Amended Complaint, ¶ 65. After AlliedSignal has spent the allocated remediation sum for remediation of all eighteen locations in the ACO, it has no contractual obligation to complete any further remediation. *Id.,* ¶ 64. While the NJDEP Submission expresses the State's expectation the ACO will result in remediation of the Site, Plaintiffs' argue this expectation is not backed by a binding requirement. *See* Plaintiffs Response Let.; Plaintiffs Reply Let. Because the allegations in a complaint must be accepted as true and a complaint can be dismissed for failure to state a claim only where it appears beyond doubt that no relief could be granted, Defendants' ripeness argument fails.[8] *See generally Sierra Club v. United States Dep't of Energy,* 734 F.Supp. 946, 948 (D.Colo.1990).

### D. *A RCRA Permit Is Not Required As Alleged In Count II*

In Count II of the Amended Complaint, Plaintiffs allege a right to bring a citizen suit under section 7002(a)(1)(A) of RCRA, 42

---

**7.** The phrase *"may present* an imminent and substantial endangerment to health or the environment" does not raise any ripeness concerns because it tracks the language of the statute. *See* 42 U.S.C. § 6972(a)(1)(B) (emphasis added).

**8.** This does not preclude Defendants from later raising the issue of mootness if, at that time, the facts warrant it.

U.S.C. § 6972(a)(1)(A), because Defendants have allegedly violated permit requirements specified in section 3005 of RCRA, 42 U.S.C. § 6925. Amended Complaint, ¶¶ 75–79. Defendants contend they are not subject to RCRA permit requirements under section 3005, 42 U.S.C. § 6925, because all disposal of chromate-bearing waste at the Site ceased more than two decades before RCRA's effective date. AlliedSignal Brief at 15–17; Grace Companies Brief at 3–5.

■ Section 7002(a)(1)(A) of RCRA provides any person may commence a civil action "against any person ... who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition or order which has become effective pursuant to this chapter." 42 U.S.C. § 6972(a)(1)(A). This citizen suit provision does not apply to treatment, storage or disposal of hazardous wastes that occurred prior to 19 November 1980. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57, 64, 108 S.Ct. 376, 381, 385, 98 L.Ed.2d 306 (1987) (42 U.S.C. § 6972(a)(1)(A) bars any suit based on "wholly past" violations of RCRA); *U.S. v. Rohm & Haas Co.*, 2 F.3d 1265, 1269 (3d Cir.1993) ("RCRA's permitting program is prospective ... [and] applies only to active ... facilities and to ... facilities closed after November 19, 1980"); *see also Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1315 (2d Cir.1993); *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1158–59 (9th Cir.1989) (42 U.S.C. § 6972(a)(1)(A) does not impose retroactive liability and does not apply to facilities at which disposal ceased in the 1970s); *Acme Printing Ink*, 870 F.Supp. at 1476–77; *Chartrand v. Chrysler Corp.*, 785 F.Supp. 666, 670 (E.D.Mich.1992) (complaint

failed to state a claim upon which relief can be granted because hazardous waste activities predated effective date of RCRA); *McClellan Ecological Seepage Situation v. Cheney*, 763 F.Supp. 431, 433–34 (E.D.Ca. 1989), *vacated on other grounds*, 47 F.3d 325 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 51, 133 L.Ed.2d 16 (1995); *Jones v. Inmont Corp.*, 584 F.Supp. 1425, 1431 (S.D.Ohio 1984).

Plaintiffs allege Defendants "continue to store [9] and/or dispose" [10] of hazardous waste without RCRA permits by virtue of the IRMs performed at the Site. Amended Complaint, ¶¶ 76–78. This argument fails as a matter of law. The EPA has consistently taken the position that RCRA permits are not required for inactive hazardous waste disposal sites that stopped accepting hazardous waste before RCRA was enacted. *See* 53 Fed.Reg. 31,149 (17 Aug. 1988) ("only facilities where hazardous waste is *intentionally* placed into land or water after November 19, 1980 require RCRA disposal permits") (emphasis added); 45 Fed.Reg. 33,068 (19 May 1980) ("[t]he Agency's intent is *not to regulate* under subtitle C portions of *facilities closed before the effective date* of the regulations") (emphasis added); 45 Fed.Reg. 12,747 (26 Feb. 1980) ("RCRA subtitle C Regulations do not cover ... abandoned sites"). Pursuant to the EPA interpretation of RCRA and case law based on the EPA interpretation, Defendants are not required to obtain RCRA permits for the Site under the facts alleged by Plaintiffs. *See id.*; *McClellan Ecological Seepage*, 763 F.Supp. at 435.

Plaintiffs further allege disposal of hazardous waste has occurred since 19 November 1980 because the chromium-bearing waste at the Site leaches into the groundwater and

---

9. The term "storage" is defined in section 1004(33) of RCRA as "the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste." 42 U.S.C. § 6903(33). The EPA implementing regulations define "storage" as "the holding of hazardous waste for a temporary period, at the end of which the hazardous waste is treated, disposed, or stored elsewhere." 40 C.F.R. § 270.2.

10. The term "disposal" is defined in section 1004(3) of RCRA as:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3).

Hackensack River.[11] Amended Complaint, ¶¶ 47–48, 78. This argument also fails as a matter of law. The EPA only requires RCRA permits at facilities where hazardous waste is intentionally placed into or on land or water after 19 November 1980. 53 Fed. Reg. 31,149 (17 Aug. 1988); 45 Fed.Reg. 33,068 (19 May 1980).

> [The] EPA's position on this issue, as the agency charged with administering the RCRA permit program, is entitled to considerable deference. This Court must defer to that Agency's interpretation of RCRA unless it finds that the interpretation is in direct conflict with the express intent of Congress or is irrational. This Court concludes that this approach is reasonable.

*McClellan Ecological Seepage*, 763 F.Supp. at 435 (citing *Chemical Mfrs. Ass'n v. Natural Resources Defense Council*, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107–08, 84 L.Ed.2d 90 (1985); *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)).

When a court reviews an agency's construction of a statute it administers, it is confronted with two questions: first, has Congress "directly spoken to the precise question at issue," and second, "if the statute is silent or ambiguous with respect to the specific issue," is the agency's interpretation "based on a permissible construction of the statute." *Chevron U.S.A.*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82. If the intent of Congress is clear, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* If Congress has not addressed the precise question at issue, the court cannot "simply impose its own construction on the statute." *Id.* at 843, 104 S.Ct. at 2782. Rather, the court must examine if the agency's interpretation of the statute is permissible.[12] *Id.*

The Supreme Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* at 844, 104 S.Ct. at 2782; *See Stinson v. United States*, 508 U.S. 36, 42–44, 113 S.Ct. 1913, 1918, 123 L.Ed.2d 598 (1993); *Chemical Mfrs. Ass'n*, 470 U.S. at 125, 105 S.Ct. at 1107–08; *see also Elizabeth Blackwell Health Ctr. v. Knoll*, 61 F.3d 170, 182 (3d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 816, 133 L.Ed.2d 760 (1996). Deference to administrative interpretation

> has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.

*Chevron U.S.A.*, 467 U.S. at 844–45, 104 S.Ct. at 2782–83; *accord Blackwell Health Ctr.*, 61 F.3d at 182. The EPA approach to RCRA permits for facilities closed prior to 19 November 1980 is reasonable.[13] Count II of the Amended Complaint is dismissed.

---

**11.** Plaintiffs mainly rely on cases in which the facilities continued to actively store or dispose of hazardous waste after RCRA's effective date. *See City of Toledo v. Beazer Materials and Servs., Inc.*, 833 F.Supp. 646, 649 (N.D.Ohio 1993) (active disposal at site continued until 1987, long after RCRA permit requirements went into effect); *Gache v. Town of Harrison*, 813 F.Supp. 1037, 1040 (S.D.N.Y.1993) (landfill ceased accepting waste in 1989); *see also Environmental Defense Fund v. Lamphier*, 714 F.2d 331, 335 (4th Cir.1983) (incineration of hazardous wastes after the effective date of RCRA); *Fishel v. Westinghouse Elec. Corp.*, 640 F.Supp. 442, 445 (M.D.Pa.1986) (disposal activity continued after RCRA permit requirements became effective).

**12.** " 'The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' " *Id.* (quoting *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072–73, 39 L.Ed.2d 270 (1974)).

**13.** The EPA approach to RCRA permits is thoroughly discussed in *McClellan Ecological Seepage:*

E. *A WPCA Permit Is Not Required As Alleged In Count III*

In Count III of the Amended Complaint, Plaintiffs allege Defendants violated sections 301(a) and 402 of WPCA, 33 U.S.C. §§ 1311(a) and 1342, by discharging hazardous waste into the Hackensack River without a permit.[14] Amended Complaint, ¶¶ 80–84. Defendants contend Plaintiff failed to allege an actionable "discharge,"[15] as defined as a term of art, and that they are not required to obtain a Federal or State water permit because there is no "point source" discharge.[16] AlliedSignal Supp. Brief at 2–3; Grace Companies Brief at 5–6; Grace Companies Supp. Brief at 2–5; Grace Companies Reply Brief at 2–3.

Section 301(a) of WPCA provides "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). Under section 402 of WPCA, however,

> [The] EPA has rationally construed the scope of its corrective action authorities under RCRA to be broader than the scope of its permitting responsibilities. RCRA clearly establishes different scopes for these two different types of regulatory activities. The permitting program and the facility management standards in 40 C.F.R. Part 264 and 265 are directed primarily at preventing releases of hazardous waste or constituents into the environment. The statute and EPA's regulations apply prospectively to treatment, storage, or disposal or hazardous waste that occurs after the effective date of the implementing regulations. The corrective action authorities, on the other hand, apply to releases of hazardous waste management activities. *See, e.g.,* section 3004(u) of RCRA, 42 U.S.C. § 6924(u) ("a permit ... shall require corrective action for all releases of hazardous waste or constituents from any solid waste management unit at a treatment, storage or disposal facility seeking a permit under this [statute], *regardless of the time at which waste was placed in such unit*" (emphasis added)). [The] EPA's distinction is also logical. Where hazardous waste is being released so as to threaten human health or the environment, [the] EPA should be empowered to take necessary measures without regard to the management status of the unit containing the waste. Preventative management standards, on the other hand, are better candidates for prospective application.

763 F.Supp. at 435–36 (emphasis in original) (footnote omitted).

the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon consideration that such discharge will meet either all applicable requirements under [various sections] of this title, or prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

33 U.S.C. § 1342(a)(1). Under the WPCA, the Federal National Pollutant Discharge Elimination System ("NPDES") permit program can be delegated to the States. 33 U.S.C. § 1342(b).

The EPA delegated the permit program to the State of New Jersey in 1982. 47 Fed. Reg. 17,331 (22 Apr. 1982). In its approval notice, the EPA stated:

**14.** The Amended Complaint contains revisions and additions to paragraphs 47 and 48, which read as follows:

47. Drainage ditches are located at the northern and southern edges of the [Site] leading to the Hackensack River. These ditches have been lined with a layer of polyvinyl chloride, a layer of another geotextile, and gravel. At high tide, backwater from the Hackensack River enters the drainage ditches. Pollutants, including chromium, are discharged from these drainage ditches at the [Site] to the Hackensack River.

48. Groundwater flow at the [Site] moves from east to west, from Route 440 to the Hackensack River. Pollutants consisting of the hazardous substances in the soil at the site *leach* into the groundwater and are carried and discharged from the [S]ite into the Hackensack River.

Amended Complaint, ¶¶ 47–48 (emphasis added).

**15.** The WPCA defines "discharge of a pollutant" as "any addition of any pollutant ... from any point source." 33 U.S.C. § 1362(12). A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

**16.** Defendants' "point source" argument is not addressed because Count III of the Amended Complaint is dismissed for failure to allege a discharge.

The [WPCA] established the [NPDES] under which permits are issued for the discharge of pollutants from point sources into the waters of the United States. Initially, the [EPA] issues these permits. States may be authorized to administer the NPDES program for discharges into navigable waters within their jurisdiction if the Administrator of the EPA determines that the State program satisfies the requirements of section 402(b) of [WPCA, 33 U.S.C. § 1342(b) ].... On December 15, 1981, former Governor Byrne of New Jersey formally requested that the Administrator of the EPA approve the State's NPDES program.... Today's Federal Register notice is to announce the approval of the State of New Jersey's NPDES program, including its pretreatment program and Federal facilities authority.... *The approval of the New Jersey NPDES permit program merely transfers responsibility for administration of permitting facilities from the Federal to the State government.*

47 Fed.Reg. 17,331–32 (emphasis added). The permits Plaintiffs argue Defendants must obtain, would be authorized and issued by the State under the New Jersey Pollutant Discharge Elimination System permit program ("NJPDES"). *See id.*

■ The Amended Complaint fails to allege an actionable "discharge" as defined under NJPDES.[17] The discharge alleged in the Amended Complaint is derived from continued leaching from pre–1954 disposal of chromium-bearing waste at the Site.

[A]s a matter of law, a discharge under the [New Jersey] WPCA is ... a *new release* from a contained area and ... *continued leaching,* contamination, flowing out and issuing of pre-enactment discharges from the soil into the waters of this State do not subject [the owner] to penalties under the WPCA.

*New Jersey Dep't of Envtl. Protection v. J.T. Baker Co.,* 234 N.J.Super. 234, 246, 560 A.2d 739 (Ch.Div.1989), *aff'd,* 246 N.J.Super. 224, 587 A.2d 279 (App.Div.1991); *accord United States v. CDMG Realty Co.,* 875 F.Supp. 1077, 1087–88 (D.N.J.1995) ("discharge" under New Jersey WPCA does not include the mere continued leaching or escaping of contaminants into water); *see also Township of S. Orange Village v. Hunt,* 210 N.J.Super. 407, 419, 510 A.2d 62 (App.Div.1986).[18] Accordingly, Count III is dismissed.

### F. *Other Grounds Asserted Are Moot*

The other grounds upon which Defendants argue Counts II and III should be dismissed are moot.

### *Conclusion*

For the reasons set forth above, the Dismissal Motions are granted as to Counts II and III of the Amended Complaint and denied as to Count I of the Amended Complaint. Counts II and III of the Amended Complaint are dismissed.

■

---

17. Plaintiffs were in possession of the Dismissal Motion for more than three weeks before the Amended Complaint was due. *See infra* Facts, Part D. Plaintiffs have not sought to amend a second time. *Id.*

18. Caselaw defining "discharge" under the New Jersey WPCA comports with the reach of the WPCA. Under the WPCA, groundwater is not considered part of the waters of the United States and discharges to groundwater are therefore not regulated under the WPCA permitting provisions. *See, e.g., Town of Norfolk v. United States Army Corps of Engineers,* 968 F.2d 1438, 1451 (1st Cir.1992); *Exxon Corp. v. Train,* 554 F.2d 1310, 1329 (5th Cir.1977); *Kelley v. United States,* 618 F.Supp. 1103, 1107 (W.D.Mich.1985).